## *In re* GRAHAM.

1. COURTS—SUPERINTENDENCE OF JUDICIARY—COURT RULES.

   The rules concerning the superintendence of the judiciary were designed as implements of procedure and due process for the constitutional mandate of superintendence (Const 1908, art 7, § 4; Rules for Superintendence of Judiciary, Nos 1-9).

2. SAME—OPEN COURT—ACTION ON RECORD.

   Courts of record usually act in open court or at chambers, on the record, with respect to judicial duties and matters subject to their jurisdiction.

3. SAME—JUDGES—RECORD—FIDUCIARIES—ACTION WITHIN JURISDICTION.

   Judges of courts of record do not usually arrange by telephone, with no record made of such doings in the court file, for distant and off-the-record conferences with fiduciaries appointed by them and remaining under their jurisdictional control, nor do they deal in such manner with estate assets which are the subject-matter of appointment and jurisdictional control.

4. SAME—PROBATE JUDGES—LOANS FROM ESTATES.

   It is both intolerable and unpardonable for a probate judge to attempt to negotiate a personal loan to him from an estate subject to his lawful control and orders and to use his official position in furtherance thereof.

5. SAME—SUPERINTENDENCE OF JUDICIARY—PRESUMPTION OF INNOCENCE—BREACH OF FIDUCIARY DUTY—PROBATE JUDGE.

   A sympathetic consideration of ethically questionable conduct and of leaning toward application of the presumption of

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 14 Am Jur, Courts § 264 *et seq.*
[2, 3] 14 Am Jur, Courts § 137.
[4] 43 Am Jur, Public Officers § 266.
[6] 21 Am Jur, Executors and Administrators § 804 *et seq.*
[7, 8, 10] 30A Am Jur, Judges §§ 24, 25.

(268)

innocence and of crass ignorance on the part of a judge of
a court of record who should, but does not, know better, normal
in matters of superintendence of the judiciary is not applied,
where facts adduced disclose a pattern of secretly attempted,
and at least once-successful, breach of duties of primary and
judicial trusteeship on part of respondent probate judge
(Const 1908, art 7, § 4).

6. EXECUTORS AND ADMINISTRATORS—APPOINTMENT OF SPECIAL AD-
MINISTRATOR—ASSETS BROUGHT TO COURT.
It is the duty of a probate judge to appoint a properly bonded
special administrator of an estate to take charge of assets of
the estate of a decedent which have been brought into court
(CL 1948, § 702.60, as amended by PA 1959, No 126).

7. JUDGES—ESTATES OF DECEDENTS—MISAPPLICATION OF FUNDS BY
PROBATE JUDGE.
Evidence presented in superintendence proceeding against probate
judge *held*, to require a finding that he had appropriated, to
his own improper use, indeterminate amounts of money be-
longing to a decedent's estate subject to his jurisdiction (Const
1908, art 7, § 4).

8. COURTS—SUPERINTENDING CONTROL—REMOVAL FROM OFFICE—IM-
PEACHMENT.
The Supreme Court's power of superintending control over other
State courts includes no power, or duty, to remove or impeach
a judicial officer, a function belonging to other branches of
government (Const 1908, art 7, § 4; art 9).

9. SAME—SUPERINTENDENCE OF JUDICIARY—EXERCISE OF POWER.
The duty of superintendence of the judiciary should be sparingly
and carefully administered (Const 1908, art 7, § 4).

10. SAME—SUPERINTENDENCE OF JUDICIARY—RECOMMENDATION OF
REMOVAL FROM OFFICE OF PROBATE JUDGE.
Recommendation, pursuant to rules concerning superintendence
of the judiciary, is made to the legislature that a judge of
probate be removed from office, where it is found that he had,
for a period of time, appropriated to his own improper use,
funds from a decedent's estate subject to his jurisdiction,
and had attempted to borrow funds from a ward's estate also
subject to his jurisdiction, the Supreme Court's power and
authority to enjoin the judge of probate from exercising the
powers and duties of his office being held in abeyance pending
the result, if any, of legislative action, during a period of
30 days from and after delivery of certified copies of opinion,

judgment, and order to the governor, president of the senate and speaker of the house of representatives (Const 1908, art 7, § 4; art 9; CLS 1956, § 168.443; Rules for Superintendence of Judiciary).

Original superintendence proceedings by Meredith H. Doyle, Court Administrator, against Henderson Graham, judge of probate, Tuscola county, to restrain further exercise of his functions in office and to effect his removal therefrom. Testimony taken January 23, 1962. (Calendar No. 49,562.) Opinion and order filed April 4, 1962, with reference to governor and legislature for removal proceedings.

*Benjamin F. Watson,* for plaintiff.

*Thomas R. McAllister,* for defendant.

PER CURIAM. June 5, 1959, this Court adopted its currently effective rules for superintendence of the judiciary of Michigan. Such rules were prepared and submitted to the Chief Justice, with due recommendation of adoption, by the board of commissioners of the integrated Michigan bar. A transcript thereof may be found in 356 Mich xv–xxi. They were designed as implements of procedure and due process for the constitutional mandate of superintendence. See Const 1908, art 7, § 4.

Following an investigation which had been instituted and concluded by the attorney general, and reference by his office of the results of such investigation to the court administrator, the present proceeding* was authorized by the Chief Justice under Rule No 3. Since Rule No 8 requires in presently indicated circumstances that the hearing court make

* This Court elected under Rule No 4 to retain jurisdiction. The issues framed by the court administrator's petition and the respondent's answer thereto were heard upon testimony taken, in open Court, January 23, 1962.

written findings of fact and law, and that such court determine such corrective and disciplinary measures as in the judgment of the court are warranted by such findings, we respond with the following findings and determination.

Henderson Graham, respondent in the present proceeding, is the duly elected, qualified and acting probate judge of Tuscola county. He was serving his second 4-year term during the period of judicial and personal action brought into present scrutiny.

Edwina Dering, by recent marriage Edwina Green, became 21 years of age since the hearing of January 23d. By guardianship proceedings instituted in the Tuscola county probate court under date of January 27, 1958, one William Walkiewicz was appointed guardian of Edwina's estate. Mr. Walkiewicz submitted his final account as such guardian and was duly discharged after having paid over to the successor guardian the accounted amount remaining in his hands, namely, $3,669.51. Shortly before such discharge Edwina's older sister, Sylvia Goszkowski, a resident of Detroit, was appointed successor guardian of Edwina's estate by order of the respondent judge dated September 21, 1959. The amount of her bond was set by respondent at the sum of $3,000. Mrs. Goszkowski's bond was approved and filed, and letters of guardianship were duly issued to her by order of the respondent.

Under date of October 3, 1960, Mrs. Goszkowski filed with said probate court an inventory of the ward's estate. The inventory disclosed then, as the testimonal record does now, that the parents of the 2 sisters had been killed in an automobile accident and that there had been distributed, to Mrs. Goszkowski as guardian of Edwina, the total sum of $16,666.67 representing Edwina's distributive share of the recovered proceeds of death actions which had been instituted, in the Livingston circuit, by

the personal representatives of the 2 parental estates. Such proceeds, added to the amount previously received, made up—on the face of the probate record—a net total of liquid assets, in the hands of the guardian, of $20,294.18 (from the added amounts we have deducted $42, consisting of allowed administration expenses).

In early February of 1961 the respondent judge, at Caro, that being the county seat of Tuscola county, telephoned guardian Goszkowski at Detroit. The purpose of his call was to open negotiations with the guardian for a personal loan, to him, from the ward's estate as reported in the probate record, in the sum of "about $20,000." Mrs. Goszkowski advised respondent that she would discuss the proposal with her sister (the ward, then a student at Michigan State University) and that she would return respondent's call. The proposal to Mrs. Goszkowski seemed "unusual." She called her attorney for advice. Her attorney thereupon called a member of the attorney general's staff; whereupon the attorney general's department undertook and concluded the investigation to which we have referred. Details of the latter follow:

Mrs. Goszkowski was directed to call respondent, as she had agreed, in the presence of 2 officers of the State Police. The call was made. In the course thereof Mrs. Goszkowski accepted respondent's offer to come to her home, in Detroit, to discuss his proposal. It was agreed that he come to her home "the following Wednesday," which was February 8th. Respondent came to the Goszkowski home as arranged, where the conversation between judge and guardian was secretly recorded by the officers. Mrs. Goszkowski testified that respondent "brought with him several documents about his real estate and insurance policies, and he was going to show that this would be a very good investment as he was—he cer-

tainly could cover the $20,000 if I ever needed it, provided that we went through with the investment." The security offered by respondent for the loan as proposed was to be a promissory note signed by himself and wife, "And he said, well, we could have —we could hold the mortgage on his home or his property, and he said—but he would just as soon not, that all really that would be necessary would be his signature and his wife's." Mrs. Goszkowski went on to relate that respondent said that "If my sister insisted upon a mortgage he would give it to her, and he said we could keep it in the house, and that it wouldn't be necessary to register it."

The following testimony, which is found established by clear preponderance, is significant at this point:

"Q. All right. Now I am still on the Wednesday conference. At any time during this day was the question of your bond as the fiduciary, the guardian, talked about?

"A. Yes.

"Q. What was said about that?

"A. That seeing that the assets were now increased from $3,000 that I would have to increase my bond, provided I did not make this loan to Judge Graham.

"Q. To him?

"A. Yes.

"Q. Now there is no question about that at all, is there, Mrs. Goszkowski—

"A. No.

"Q. —in your mind?

"A. No.

"Q. Do I gather, then, that if you agreed to make this loan to him your $3,000 bond would continue as adequate in his court?

"A. Yes."

The conference of February 8th, at the Goszkowski home, was left "with no decision made." Respond-

ent appeared desirous of an answer "at some early date" and Mrs. Goszkowski agreed to get in touch with him later. Two days later, by appointment, Mrs. Goszkowski went to the Detroit office of the attorney general. There she placed a call to respondent. On that occasion she told respondent "that we would not discuss this any more because we would not go through with any type of a note or an investment with him personally." Later that day respondent called Mrs. Goszkowski again and expressed a desire to discuss the proposed loan with the ward, suggesting that "he could go to East Lansing and talk to her." Mrs. Goszkowski then advised that she would discuss the proposal with the ward and "would return his call." That she did, later in the day. Respondent was advised "That my sister would be in Detroit the following day and that if he would like to come to my home he could speak to her." Respondent replied that he would be there at the appointed time: 1 o'clock in the afternoon. The meeting as arranged was duly held. The 2 sisters were present, along with respondent. Officers Whalen and Denkel were present in the home. Their presence was not disclosed to respondent, and the entire conference was tape recorded by them.

The same proposal, to borrow approximately $20,000 from the ward's estate, was presented by respondent and discussed for approximately 1 hour. The 2 sisters finally told respondent that their decision was "No", whereupon respondent told the two that the guardian's bond would have to be increased from the then amount of $3,000 if the proposed loan was not made and if made the $3,000 bond would remain without ordered increase of the amount thereof.

It is unnecessary to detail further the evidence of respondent's design. It was proven clearly and is

not categorically denied. And we cannot help noting, with a feeling of shame, the secrecy this judge of a court of record employed as he sought to take over and apply, to his own use, funds of which he was a primary, as well as judicial, trustee. Courts of record usually act in open court or at chambers, on the record, with respect to judicial duties and matters subject to their jurisdiction. The judges thereof do not usually arrange by telephone, with no record made of such doings in the court file, for distant and off-the-record conferences with fiduciaries appointed by them and remaining under their jurisdictional control. Nor do they deal in such manner with the subject-matter of appointment and jurisdictional control, that is, estate assets.

This Court finds that, on and prior to February 11, 1961, the respondent judge sought affirmatively if unsuccessfully to negotiate secretly a personal loan to him from an estate subject to his lawful control and orders, in the sum of approximately $20,000, and to use his official position in furtherance thereof. Such conduct on the part of a judge is both intolerable and unpardonable. We shall say more of this later.

The respondent judge was given full opportunity to explain and excuse his conduct. An all day hearing was provided with all eligible members of the Court participating. No further time for presentation of additional proof was requested. Respondent's defense, submitted by testimony and with the aid of able counsel, is that he is not legally schooled, that he was not versed or familiar with the canons of judicial ethics, that he was guilty at worst of poor judgment, that he was activated by honest if ill-advised motives, that adequate security for the proposed loan would have been provided, and that no injunctive or recommendatory order should issue as prayed in the court administrator's

petition.* For reasons already indicated and others to follow, this position is found wholly untenable.

In matters of superintendence particularly, our normal instinct is that of sympathetic consideration of ethically questionable conduct and, where some doubt exists, that of leaning toward application of the presumption of innocence and crass ignorance on the part of one who should, but does not, know better. In such instances the inclination of a constitutionally charged superintendent might well be that of ordering a judgment of censure and reprimand only. But there are other facts, shown here beyond fair dispute, which require forceful action. We simply cannot overlook a disclosed pattern of secretly attempted and once-successful "borrowing," by a probate judge, from estates under his jurisdiction. Once such pattern is discovered, the opportunity of continuity thereof must be concluded with firmness and resolution.

It was established testimonially, during the hearing of January 23d, that the respondent actually took over and commingled with his own funds certain cash which at all times belonged of right in the hands of a duly appointed fiduciary of another estate under his jurisdiction. Study of such testimony has resulted in our calling in, for examination, the Tuscola county probate file entitled "In the matter

---

* The prayer is as follows:

"Wherefore, your petitioner prays that the Court forthwith enter its order commanding respondent to desist and refrain further from exercising the powers and functions of said office of judge of probate or in any way, directly or indirectly, interfering with or impeding the orderly operation of said office of judge of probate of said county of Tuscola until the further order of the Court; and further, that the Court forthwith direct a written communication to the legislature of the State of Michigan requesting the adoption of a concurrent resolution of 2/3 of the members elected to each house thereof, under and by virtue of the provisions of article 9, section 6 of the Constitution of Michigan (1908), demanding of the governor the immediate removal of said respondent, Henderson Graham, from said office of judge of probate of the county of Tuscola."

of the estate of John Prief a/k/a John Brief, deceased."

A few days after Mr. Prief's death a Mr. Montague brought in, to the Tuscola county probate court, certain amounts of cash belonging to the decedent. The first amount was $2,990. It was brought in November 25, 1959, and receipted for as estate funds by the probate register, Mrs. Douglas Putnam (a witness during the hearing of January 23d). The next amount, $661.51, was brought in by Mr. Montague on November 27, 1959, and receipted for by respondent as estate funds. No special administrator was appointed* and it was not until October 31, 1960, that Claude Sirdan, another witness who testified during the hearing of January 23d, was appointed executor of Mr. Prief's will upon order of respondent. Mr. Sirdan promptly asked respondent for the money belonging to the estate and, shortly after such request, received $2,990 thereof from respondent. On the first occasion thereafter, when Mr. Sirdan asked for the balance, respondent said "I'll have a check in the mail shortly." No check was sent. Still again Mr. Sirdan asked the judge for the balance. The judge replied "You don't need the money too bad right now, and I'll have it to you shortly." It was not until the estate was ready for closing and distribution that respondent paid the balance and, being in doubt respecting the amount owing by him to the estate,† did so by his personal "blank check" sent to the attorney for the

---

* When the funds were brought in it was the plain duty of Judge Graham to appoint, immediately, a properly bonded special administrator of Mr. Prief's estate to take charge of such assets. See CL 1948, § 702.60, as amended by PA 1959, No 126 (Stat Ann 1959 Cum Supp § 27.3178 [130]).

† Judge Graham apparently kept no record of the amounts receipted for November 25 and 27, 1959. It was by resort to the receipts given Mr. Montague that the attorney for the estate was able to compute the amount owing and thus ready the estate for distribution.

estate. The latter was told to compute what was due from the judge and to fill out the check as to amount, which he did.

The only explanation offered by Judge Graham, for retention of the remaining six hundred odd dollars received by him from Mr. Montague, was that "It apparently got into a compartment where I kept some of my own personal money at times." We cannot accept this as an excuse for such judicial misconduct and find as a fact that the respondent appropriated, to his own improper use, between November 27, 1959, and the distribution of the Prief estate on May 16, 1961, indeterminate amounts of money belonging to the estate.

The judgment of this Court is sufficiently indicated by findings of fact and law aforesaid. Our constitutional obligation is clear. The "unlimited" extent of exigent duty arising under the constitutional mandate was unanimously considered and plainly defined in *In re Huff,* 352 Mich 402. It includes no power of or duty to remove or impeach a judicial officer, a function belonging to other branches of government under article 9 (Const 1908), yet it brooks no shrinkage from that which was pressed upon this Court, by the people, on 2 separate occasions, once in 1850 and again in 1908.

In modern times the present proceeding is the second occasion only when disciplinary action under the superintendence section has become imperative. This speaks volumes to the general credit of Michigan's judiciary. It shows, too, that the duty of disciplinary superintendence is, as it should be, sparingly and carefully administered. We regret, then, that action of such nature has to be taken now against a judge of a subordinate court. Regret, however, relieves us no whit from duty. Here it is shown abundantly, by proof we have seen uttered, heard uttered, and then have examined with requisite

reading care, that a judge of one of our courts of record has been guilty of that kind of misconduct which would require firm animadversion of any responsible superintendent.

## Judgment and Order

It is the judgment of this Court that there is reasonable cause, within meaning and purpose of section 6 of article 9 of the Constitution (1908), for recommendation under Rule 8 that the legislature, after due hearing (see CLS 1956, § 168.443 [Stat Ann 1956 Rev § 6.1443]), adopt a concurrent resolution for removal of Henderson Graham, judge of the probate court of Tuscola county, from such judicial office.

It is adjudged accordingly that this Court does so recommend.

Upon due consideration of the foregoing it is

Ordered that certified copies of the foregoing opinion, and of this appended judgment and order, be forthwith transmitted by the clerk to the governor, and to the president of the senate and the speaker of the house of representatives, and

Ordered further, that the records and files of this Court in the matter of the proceeding entitled above, including the transcript of all testimony taken during the hearing of January 23d and the State police tape recordings marked exhibits 1 and 2, and expressly including the 2 Tuscola county probate files that are now in custody of the clerk, be made available under supervision of the Chief Justice to such committee or committees of the legislature as may have need for same.

It is further ordered that the question whether this Court shall employ its power and authority to enjoin said judge of probate, from exercising the powers and duties of said judicial office, be held in

abeyance pending the result if any of legislative action, as recommended above, during a period of 30 days from and after delivery of such certified copies to the governor, the president of the senate, and the speaker of the house of representatives.

CARR, C. J., and DETHMERS, KELLY, BLACK, KAVANAGH, and OTIS M. SMITH, JJ., concurred.

SOURIS, J. (*concurring*). I concur in my Brothers' finding of facts, the conclusions reached therefrom, and the recommendation to the legislature and to the governor that respondent be removed from office as provided by Const 1908, art 9, § 6. However, our constitutionally mandated duty to exercise general superintending control over inferior courts (art 7, § 4) requires more from us. We should forthwith enter our order enjoining respondent from exercising the powers and duties of his judicial office pending the legislative and executive action recommended, or until further order of this Court.

We have found that respondent's misconduct, related to the performance of his judicial duties, was shameful, unpardonable and intolerable and for such misconduct we have recommended his removal from office. How, then, can we justify his interim exercise of judicial authority, authority which rests alone upon the public's continuing confidence in the moral integrity of its judgments? I cannot. Nor can I justify exposing the citizens of this State, not alone of Tuscola county, to the possibility of continuing depredations by this respondent until the legislature and the governor are able to act.

ADAMS, J., did not sit.