IN THE MATTER OF EDWARD J. DESAULNIER, JR.
& another (No. 4).

Suffolk.    November 15–19, 22–24, 29,
                                    December 1, 1971. — January 11, 1972.

Present: TAURO, C.J., CUTTER, REARDON, QUIRICO, & BRAUCHER, JJ.

*Judge. Supreme Judicial Court,* Jurisdiction, Supervision of inferior
    courts. *Constitutional Law,* Independence of the judiciary.

The sources of the authority of the Supreme Judicial Court of
    Massachusetts to supervise judges of the Commonwealth give this
    court the power and duty as a matter of judicial administration to
    prevent a judge of an inferior court who has been guilty of serious
    judicial misconduct from exercising the powers and duties of his
    office. [807–809]
Supervision of the judges of Massachusetts by the Supreme Judicial
    Court does not constitute an interference with the independence of
    the judiciary established by art. 29 of the Declaration of Rights of
    the Massachusetts Constitution. [809]
Statement of the standards of personal and judicial conduct to which
    judges must be held, with particular reference to a set of Canons of
    Judicial Ethics proposed by an American Bar Association commit-
    tee. [809–811]
The conduct of a judge, as shown by the findings of the Supreme
    Judicial Court, fell far short of promoting "public confidence in the
    integrity and impartiality of the judiciary."[811]
Possession of a real estate broker's license by a justice of the Superior
    Court gave an impression of an intention to engage for others
    generally in real estate transactions in violation of the mandate of
    G. L. c. 212, § 27, that justices of such court should "devote their
    entire time during business hours to their respective duties."
    [811–812]
A full time judge of a Massachusetts court should give full time to his
    position. [812]
Statement of activities in which a full time judge of a Massachusetts
    court should not engage. [812]
Any attempt to tamper with a judicial disposition of a case should be
    immediately reported by the judge so approached to the Chief
    Justice of his court. [813]
A judge "must possess the perfect confidence of the community."
    [813]

The Supreme Judicial Court, upon the whole record and the court's subsidiary findings on hearing two informations relating to the conduct of the respondent, a member of the bar, an associate justice of the Superior Court, and a member of the Bail Committee thereof, concluded that the respondent's conduct in collaborating for a consideration with professional bail bondsmen in influencing disposition of larceny cases against a swindler, in communications with the judge presiding at the criminal session dealing with such cases, in dining and drinking in places of public entertainment, sometimes gaming establishments, with one of the bondsmen, in borrowing money from him, in personal telephone calls at county expense, and in acquiring a real estate broker's license, made the respondent unfit to continue either as a judge or as a member of the bar, and the court therefore ordered as a matter of judicial administration that the respondent should not exercise the powers and duties of a Superior Court judge until further order of this court, and that a separate order of disbarment of the respondent should be entered. ⌊813–814⌋

The Supreme Judicial Court, upon the whole record and the court's subsidiary findings on hearing an information relating to the conduct of the respondent, an associate justice of the Superior Court who had presided at a criminal session, concluded that the respondent's conduct in the handling and the disposition of larceny cases against a swindler, particularly in receiving without objection communications from another justice of the Superior Court attempting to obtain continuances and to influence disposition of the cases, deserved and required censure, and the court censured the respondent. ⌊814⌋

An associate justice of the Superior Court, upon being identified in the press as the judge who had presided over and disposed of larceny cases against a swindler, in the circumstances appropriately released to the press a copy of the stenographic transcript of the court proceedings, but the holding of a press conference by the judge was of highly questionable propriety on the part of all participants. ⌊814⌋

*Robert V. Mulkern* for the respondent Vincent R. Brogna.

*Walter J. Hurley* for the respondent Edward J. De-Saulnier, Jr.                    •

*Edward B. Hanify,* Special Counsel (*John M. Harrington, Jr.,* Special Counsel, with him).

BY THE COURT. On September 8, 1971, the Chief Justice of the Superior Court filed a petition for the appointment of counsel, stating that he had been engaged in the investigation of "charges and allegations of misconduct of two Judges of the Superior Court." This misconduct was "averred, principally at least, to have taken place with

respect to a criminal case in Middlesex County but is not necessarily confined thereto." On the basis of his investigation the Chief Justice of the Superior Court stated his opinion that public interest required prompt presentation of an information to the full court "setting forth allegations concerning the matters investigated" and sought "that a thorough judicial inquiry into such matters be instituted forthwith by the full court in such manner as the full court may hereafter determine." It was stated in the petition that in the public interest and in fairness to all concerned the information should be prepared by independent counsel selected by the full court.

Thereafter, the full court did appoint Edward B. Hanify, Esquire, and John M. Harrington, Esquire, as special counsel. On October 4, 1971, two informations were filed in this court by special counsel, the first against Edward J. DeSaulnier, Jr. and Vincent R. Brogna, and the second against Edward J. DeSaulnier, Jr. alone. The informations and answers thereto are appended as appendices A and B. Since the subject matter of the two informations is distinct, they will hereafter be separately treated.


INFORMATION IN THE MATTER OF
EDWARD J. DESAULNIER, JR. AND VINCENT R. BROGNA.

The first information (Appendix A) sets forth in detail the chronology of events leading to the final disposition of two Massachusetts criminal cases (larcenies) involving Michael Raymond. The representations contained in the information are based primarily on statements made by Raymond and others, official court records, and transcripts. In essence, Raymond stated that in 1962 he made payments to I. Charles Baker, a surety bail bondsman, upon Baker's representation that he could insure a favorable judicial result in Raymond's cases. Baker further stated, according to Raymond, that the arrangement for disposition of his matters was to be made through Judge DeSaulnier. From June of 1962 until the final disposition, Raymond was

represented by Mr. Richard G. Crotty of Worcester, who was
an intimate social friend of Judge DeSaulnier. Raymond's
cases came before Judge Vincent R. Brogna in September,
1962. After several continuances, and after a partial
restitution agreement had been reached with the victims of
Raymond's larcenies, Raymond was given a suspended
sentence and placed on probation. Following his final court
appearance on September 28, Raymond and Baker met
Judge DeSaulnier in a public place known as the Darbury
Room. Raymond's matter was referred to, and Judge
DeSaulnier expressed his pleasure in "doing business" with
Raymond.

In his answer to the information, Judge DeSaulnier admits
knowledge of statements made by Raymond that are the
basis of certain paragraphs in the information. He does
not dispute the truth of those portions of the information
which make reference to the dockets and the official tran-
scripts of the court. He denies any involvement in the
Raymond matter and states he has no memory of having
ever met or talked to Raymond. He further states that he
cannot assist the court as to the accuracy of certain portions
of Raymond's testimony. He points out that Raymond
has elsewhere made statements in conflict with those set out
in the information. As to his relationship with Mr. Crotty,
Judge DeSaulnier states that he was socially a friend of
Mr. Crotty and became gradually friendlier with him, but
that this did not, to his knowledge, bear on Mr. Crotty's
employment as counsel for Raymond.

In his answer, Judge Brogna admits awareness of state-
ments made by Raymond that are the basis of certain para-
graphs in the information. He does not dispute the truth
of those portions of the information which make reference
to the dockets and the official transcripts of the court. He
denies having had any contact concerning the disposition
of the Raymond matters with Judge DeSaulnier, I. Charles
Baker (hereinafter called Baker), or Nathan Baker, or any
person not legitimately connected with the handling of the

cases. He states his handling of the Raymond cases was in the best interests of the Commonwealth and of the parties before him, and that his disposition of them was proper and routine. He further states that he cannot assist the court as to the accuracy of certain portions of Raymond's testimony although he noted that Raymond has elsewhere made statements in conflict with those set out in the information.

## FINDINGS OF FACT.

After hearing, and upon consideration of (a) the evidence, (b) admissions in the pleadings, and (c) matters of public record of which we take judicial notice, and after making permissible inferences from the foregoing, we find that the following facts are established by a fair preponderance of the evidence.

1. Edward J. DeSaulnier, Jr., was admitted to the bar of Massachusetts on April 14, 1948, and was appointed an Associate Justice of the Superior Court on December 30, 1958. Vincent R. Brogna was admitted to the bar of Massachusetts on December 10, 1941, and was appointed an Associate Justice of the Superior Court on December 7, 1960. Judge DeSaulnier, who had previously served in the House of Representatives, was a member of the State Senate during 1957 and 1958, and Judge Brogna served as Special Counsel to Governor Foster Furcolo from 1957 to 1960. Because of their respective political positions, we conclude that these two men were acquainted as early as 1957.

2. On November 6, 1961, Raymond was arraigned in the Middlesex Superior Court on indictment No. 57940, charging larceny of approximately $18,000 from Evelyn Lewis. The indictment contained three counts, and was based on Raymond's alleged fraudulent exchange of worthless oil and gas leases for cash and marketable securities owned by Miss Lewis. Just prior to this arraignment, Raymond had completed a sentence in the United States Penitentiary at Lewisburg, Pennsylvania, and had been transferred to the

Middlesex County House of Correction. Shortly after arriving at the House of Correction, Raymond retained Mr. James O'Donovan as attorney. Mr. O'Donovan effected a reduction of Raymond's bail from $10,000 to $5,000. Raymond was released upon furnishing a $5,000 surety bail bond executed by Nathan A. Baker, as Attorney in Fact, for the Continental Casualty Company. At that time, and at all material times, Nathan Baker was an intimate social friend of Judge DeSaulnier, and he and his elder brother, I. Charles Baker, were engaged in the business of providing surety bail bonds.

3. Upon his release from custody, Raymond returned to New York where he became involved in certain securities transactions of the Red-O-Lier and the Wavetronics Corporations. Mr. O'Donovan made several attempts to get in touch with Raymond in order to prepare a defence for his Massachusetts case, and in order to collect a fee.

At some time between his release from custody in November, 1961, and May, 1962, Raymond attempted to insure a favorable result in his Massachusetts case by a payment of $10,000 to Stanley Polley of New York, who tried to work through one Nathan Voloshen. This money, however, was returned to Raymond because it was not possible to insure the result sought by him.

4. On May 22, 1962 (all dates hereafter are in 1962 unless otherwise stated), Mr. O'Donovan appeared for Raymond in the Middlesex Superior Court and was granted a continuance until May 25 by Judge Edward A. Pecce. Judge Pecce ordered that no further continuances be granted. Mr. O'Donovan withdrew his appearance on May 24.

5. On May 24, Mr. Paul T. Smith filed his appearance as counsel for Raymond through his associate, Mr. Raymond Dowd. Stanley Polley had been in touch with Mr. Smith and had told him Raymond would be in to see him. Mr. Dowd secured another continuance until May 29. During a May 25 interview with Mr. Smith, Raymond sought to obtain a "guarantee" that he would "hit the street."

Mr. Smith replied that the only guaranty he could give him was that he would use his best abilities for him. Not satisfied with this, Raymond left the office. Mr. Smith filed a withdrawal of his appearance on May 28.

6. Raymond next sought the services of Attorney Robert Lombard for the purpose of obtaining a continuance until the fall. This continuance was highly important to Raymond because he was then heavily involved in various stock promotion activities in New York. Mr. Lombard referred him to Mr. James F. Morelli, who did obtain a continuance from May 29 to June 8. Again Judge Pecce ordered that there be no further continuances.

7. At this time Raymond was quite worried about his situation. He had failed to accomplish anything toward insuring a favorable result in his Massachusetts case. After appearing in court with Mr. Morelli on May 29, he went to the office of Baker, who said to him: "Well, you finally got here. You have been all over town, and you have got a serious problem, and you finally came to the right place." Baker assured him that he could secure a continuance for him through the fall, and that he could insure an ultimate disposition that would involve no jail sentence. He said that the matter would have to be handled on a "judge to judge basis." Raymond paid Baker $10,000 to obtain the continuance.

8. On June 8, Mr. Morelli was granted a continuance by Judge Robert Sullivan (the case was put "off the list") on the unsupported oral representation by Mr. Morelli that a key witness was in Canada. This story was contrived by Baker and Raymond.

9. Also on June 8, while in the Middlesex Superior Court, Raymond was arrested on a warrant from the First District Court of Northern Middlesex (Ayer), based on a complaint of larceny of approximately $17,000 from Sylvia Barrows. This complaint was in one count. Bail was set at $20,000. Baker posted the surety bail bond. Raymond appeared again in the Ayer Court on June 9 with Mr. Morelli, and the case was continued until June 23. There is no evidence

leading to any suspicion of any impropriety by any of Raymond's counsel up to June 9, 1962.

10. Prior to June 23, a contact was made with Mr. Richard G. Crotty, an attorney, of Worcester and an interview for Raymond was arranged. At that time and at all material times Mr. Crotty was an intimate social friend of Judge DeSaulnier. Mr. Crotty's experience was primarily in the trial of civil cases, and he had never fully tried a criminal case in the Superior Court. On June 18, prior to the interview with Raymond, Mr. Crotty called Mrs. Barrows to ask for information relative to her complaint.

11. Sometime between June 18 and June 23, Baker drove Raymond to Worcester to meet with Mr. Crotty; Baker instructed Raymond to tell Crotty that a member of Raymond's family had gone to school with Judge DeSaulnier. It was during this trip that Baker first told Raymond that Judge DeSaulnier would arrange the disposition of the matter with the sitting judge. Baker "indicated that the judge was capable and influential and could get the job done."

12. At the interview Mr. Crotty told Raymond that he thought very highly of Judge DeSaulnier and "would do anything in his power for him." The Ayer matter alone was discussed at this time, and Mr. Crotty believed that he was then representing Raymond in that matter only. At this meeting Mr. Crotty did not collect the customary retainer because he was told that Raymond had no money.

13. On June 23, Mr. Crotty, Raymond, Sylvia Barrows, her attorney Mr. Ralph Bowmar, George F. Harnois, a State police lieutenant, and Groton Police Chief Elliot P. Clark all met at the Ayer District Court. Mr. Crotty and Mr. Bowmar asked Judge Lyman K. Clark (now deceased) for a delay that they might work out a restitution agreement. They then went to Mr. Bowmar's office. There they reached an agreement providing that Mrs. Barrows would request the Ayer District Court to dismiss the complaint against Raymond in return for installment payments totaling $11,000 by December 19, the last payment date. Judge

Clark then continued the case until August 15. Mr. Crotty believed that if Raymond continued to make the payments called for by the restitution agreement he would not be bound over to the grand jury.

14. Pursuant to the restitution agreement, Raymond paid $1,700 in two installments. On August 15, despite the fact that Raymond was complying with the agreement, Judge Clark ordered him bound over. Mr. Crotty made no effort on behalf of his client to prevent this. Raymond paid a third installment of $200 as agreed in the first days of September.

15. On September 7, the Middlesex County grand jury returned an indictment (No. 65677) against Raymond charging larceny from Sylvia A. Barrows.

16. On September 10, indictment No. 57940 was called for trial in the first criminal session of the Middlesex Superior Court presided over by Judge Brogna. Mr. Joseph Neylon, Assistant District Attorney, informed the court that Mr. Morelli intended to withdraw his appearance for Raymond. It was uncertain whether Raymond had been notified to appear that day. Judge Brogna directed the clerk to notify Raymond at his New York address that his case was scheduled for September 17, and that if he did not appear he would be defaulted.

17. On September 11, indictment No. 65677 was called for arraignment. The clerk indicated that Mr. Crotty would be representing Raymond; and, in response to an inquiry from Judge Brogna, he stated that "the bondsman" had given him Mr. Crotty's name. Judge Brogna then directed that Mr. Crotty be called, and continued the case to September 17 for arraignment.

18. On September 17, both criminal indictments against Raymond were on the trial list. Mr. Crotty had notified Raymond through Baker of the September 17 proceedings. Raymond, however, did not attend. Despite Judge Brogna's statement on September 10 that if Raymond did not appear on September 17 he would be defaulted, he was not defaulted

when he failed to appear on the 17th. The transcript for the 17th shows no statement by Judge Brogna or by anyone else concerning the entry of a default against Raymond for failing to appear.

19. The only entry in the transcript of September 17 with reference to the Raymond cases is that when they were called Judge Brogna stated, "That's over to the 27th." The transcript for that day discloses no statement whatever on the Raymond matter by any representative of the district attorney's office or by Mr. Crotty. These developments were in marked contrast to the events of September 10 and 11. The transcripts for these dates reveal (1) that the prosecution was strongly opposed to any further continuance of these cases, (2) that Judge Brogna was fully informed of Raymond's tactic of attempting to delay a trial of indictment No. 57940 by changing attorneys, and (3) that he was determined not to tolerate further delays. The transcript for September 17 contains no request by anyone for a continuance of the Raymond cases, but it is clear that trial of indictments charging felonies could not commence without the defendant present.

20. The transcript for September 17 does not indicate that Mr. Crotty was present. However, on that date an appearance was entered in Mr. Crotty's behalf for Raymond in the Lewis matter. Prior thereto he had represented him only in the Barrows matter. Mr. Crotty had received no fee or retainer on either of the two cases. To that date he had had little, if any, communication from Raymond since June 23. In that situation, and despite Raymond's failure to appear for what he had been told was a very important court date, Mr. Crotty filed his appearance in the second case. He testified that before the call of the list on September 17, "somehow or other we got word to . . . [Judge Brogna] that I wasn't prepared to go forward." Mr. Crotty wanted a continuance to September 24.

21. The transcript for September 17 contains no statement by Judge Brogna of his reasons for continuing the case to September 27. The latter date was the next to the

last day of the September term, a day ordinarily reserved in Judge Brogna's session for cases expected to be disposed of on guilty pleas without trial. This action by Judge Brogna may indicate that he believed the cases would be disposed of without trial. There is nothing in the transcripts of the proceedings to that date which could form the basis for such a belief. The district attorney's office is not shown to have abandoned its consistent attitude of pressing for trial of the indictments against Raymond. The transcript for the 17th does not indicate that the judge called upon the prosecution to state its position on whether Raymond should be defaulted or on the date to which the cases would be continued. To that date Mr. Crotty had not communicated with Miss Lewis to ascertain whether something less than full restitution would be acceptable to her, and he did not do so until September 27. Any basis for Judge Brogna's indicated belief on the 17th that these cases would be disposed of without trial came from something other than any of the stenographically recorded proceedings in the cases.

22. After the September 17 continuance, Mr. Crotty communicated to Raymond, either directly or through Baker, the new date of the trial. Mr. Crotty never attempted to advise Raymond as to the amount of money that might be needed for restitution. Nor did Mr. Crotty seek to work out the details of a restitution agreement with the other parties before the September 27 hearing.

23. Some time in September, Baker called Raymond in New York to urge him to come to Boston at once. Raymond thereupon came to Baker's office in Boston. There Baker told Raymond that "a judge had died and that the next judge that was going to be sitting . . . was someone that he could not handle; and he had five or six days to handle, or bring . . . [Raymond's] matters to a head." (Judge Jesse Morton, who had been scheduled to sit in the September criminal session in Middlesex, had died on May 21, 1962. In July, 1962, Judge Brogna had been assigned to that sitting as a replacement and was sitting at the time of

Baker's telephone call.)   Baker and Raymond agreed that within that time Raymond would provide $15,000 for restitution and $35,000 to Baker for a suspended sentence.

During this period in 1962 Raymond was involved in certain financial transactions that enabled him to have access to large sums of money.   He had sold stock in Wavetronics Industries, Inc. during the summer of 1962, and this had generated a substantial sum.   On or about September 25 he borrowed $30,000 from New York loan sharks.   He likewise was the ultimate recipient of $50,000 borrowed from the Bankers Trust Company nominally by one Jerome Naftol, also on September 25.   Hence, from these various sources Raymond was able to secure the necessary $50,000 and return to Boston by September 26, at which time he turned over the money to Baker.

24. Raymond accompanied Baker to the Middlesex County Court House on September 27 for the final disposition of his cases.   There, they met Mr. Crotty and handed over to him an attaché case which then contained $15,850.   This marks the first time that Mr. Crotty was aware of the amount of money that would be available to work out a restitution agreement.   Mr. Crotty then attempted to work out a settlement, based on that figure, with the representatives of the parties: Assistant District Attorney Neylon, Mr. Bowmar, and Officer Galligan.   If restitution could not have been effected, Mr. Crotty was not prepared to try the case.   There is no indication that either case could have been successfully defended.

25. During the afternoon of September 27 Raymond was informed that it was necessary that a period of probation accompany his suspended sentence.   Because probation would mean supervision over his financial activities, Raymond told Baker that he could not tolerate such a situation and would not agree to it.   At that time Baker informed him that the probation could be transferred to New York under the "Mayflower Compact."   Thereupon Baker telephoned Judge DeSaulnier who, in conversation with Raymond, im-

pressed upon him the necessity of probation. Raymond repeated to Judge DeSaulnier his objections to probation but said he would call New York to determine whether he could "handle" the supervision in New York. Raymond then called Stanley Polley in New York, who indicated that the probation supervision probably could be rendered ineffectual there. Polley told Raymond to come to New York immediately. Raymond then told Baker to delay the proceeding "until tomorrow" so that he could return to New York.

26. The original stenographic notes for the proceedings on the 27th before Judge Brogna in the First Criminal Session, Middlesex County Superior Court, indicate that there was a luncheon recess from 12:55 P.M. to 2:50 P.M. At 3:10 P.M., Judge Brogna ordered a recess during a witness's testimony in the jury waived case he was hearing. At 3:13 P.M., the recess ended, and the witness resumed testifying. Sometime between 3:20 and 3:30 P.M., after the witness had concluded testifying, Judge Brogna stated: "Before we start with this witness, are you people ready with the Raymond case?" Mr. Crotty replied, "We'd like to approach the bench." The transcript is silent as to what transpired at this bench conference. After this conference the Raymond cases went over to the next day. The transcript shows no request by counsel nor any order by the judge for such a continuance, nor does it include any statement by anyone of the reasons therefor. We conclude that at some time prior to the bench conference Judge DeSaulnier communicated to Judge Brogna his desire for a continuance of the Raymond cases, and the cases and their continuance were the subject of the unrecorded bench conference and of a conference by Mr. Crotty and the prosecuting attorney with Judge Brogna in his lobby earlier on the same day.

27. Back in New York, Raymond met Stanley Polley who arranged through Judge Mitchell Schweitzer, a New York Supreme Court judge, to make ineffective the supervision of Raymond in New York. For this, Raymond paid Polley $20,000, the ultimate disposition of which is not clear to us.

28. Raymond returned to Boston the following day, September 28, and met Baker and Mr. Crotty at the court house. A series of conferences held on September 27 or 28 between Mr. Crotty representing Raymond, Mr. Bowmar representing Mrs. Barrows, and Cambridge police sergeant John F. Galligan representing Miss Lewis resulted in an agreement that Raymond would pay $15,000, of which Miss Lewis would receive $8,000 in full payment and discharge of her claim of $18,000, and Mrs. Barrows would receive $7,000 (in addition to the sum of $1,900 received by her under the Ayer restitution agreement) in full payment and discharge of her claim of $17,000. This was reported to the prosecutor assigned to the case, Assistant District Attorney Neylon, who reported it to his superior, First Assistant District Attorney Richard S. Kelley. With the latter's approval, Mr. Neylon then agreed with Mr. Crotty that if Raymond pleaded guilty the prosecution would recommend that he be given a suspended sentence of three years and that he be placed on probation for three years. Mr. Kelley was responsible for deciding what recommendation the office of the district attorney would make on the disposition of cases. In his initial review of the Raymond case for that purpose he made an entry in the file that the recommendation would be for a sentence of three to five years at the Massachusetts Correctional Institution at Walpole, without suspension of the sentence. That entry continued in effect until the change described above. The proposed restitution was a factor in the change in proposed recommendation.

29. On September 28, after the parties had reached the agreement for restitution and for recommendation of disposition described above, a conference was held with Judge Brogna in his lobby. The persons present in addition to the judge were Mr. Crotty, Mr. Neylon, Mr. Bowmar, Sergeant Galligan and Assistant Probation Officer Walter E. Lawler. Captain (then Lieutenant) Marckini of the Cambridge police who had investigated the Lewis matter did not come to court either on September 27 or September 28

on assurances to him from some source that the cases were going to plea and disposition. Mr. Crotty reported to the judge on the agreement which had been reached by the parties, and also told the judge of the efforts Raymond had made to raise the sum of $15,000. Judge Brogna asked Mr. Bowmar whether Mrs. Barrows was satisfied with the agreement. Mr. Neylon asked Sergeant Galligan the same question concerning Miss Lewis. Both answered in effect that the ladies were satisfied. Miss Lewis had in fact previously expressed the opinion that Raymond should go to jail but she eventually agreed to the proposed restitution. This lobby conference was not recorded stenographically.

30. At the conclusion of the lobby conference described above, all of the participants went to the court room where the court reconvened with Judge Brogna presiding. The indictment charging Raymond with larceny from Mrs. Barrows was called and Raymond pleaded guilty. This was the first time he had been called upon to plead to this indictment. The indictment charging him with larceny from Miss Lewis was called and he retracted his prior plea of not guilty and pleaded guilty. The clerk informed Judge Brogna that Raymond was entitled to a mental examination. G. L. c. 123, § 100, as amended by St. 1956, c. 589, § 7. The judge said: "Have him waive it." Thereupon Raymond orally waived his right to such an examination. Mr. Neylon then called on Sergeant Galligan to state the facts of the larceny from Miss Lewis to the court and he stated them. Mr. Crotty did not cross-examine the witness. Mr. Neylon then called on Lieutenant Harnois to state the facts of the larceny from Mrs. Barrows and he stated them. In answer to two questions put by Mr. Crotty, the witness said that Raymond had given Mrs. Barrows a promissory note bearing interest at one per cent a month. Judge Brogna then asked Mr. Neylon whether he had a recommendation to make. Mr. Neylon then made the recommendation which had been previously agreed upon by the parties and discussed by them with Judge Brogna in the lobby conference. The judge then stated that he had looked at the file and asked whether the amount of the restitution was

satisfactory to the victims of the larcenies. Mr. Bowmar and Sergeant Galligan answered that it was. Thereupon Mr. Crotty said: "Your Honor, I accept the recommendation of the District Attorney's Office." Raymond was then sentenced to confinement in the Massachusetts Correctional Institution at Walpole, for a term not exceeding five years nor less than three years on each of the two indictments, the sentences to be served concurrently. The sentences were ordered suspended and Raymond was placed on probation for three years. The only special condition of the probation was that Raymond "make restitution in the sum of $15,000 forthwith." There was no order for additional restitution of any part of the additional amount which he had admitted stealing from Mrs. Barrows and Miss Lewis. There is nothing in the transcript of September 28 to indicate that any inquiry was made in open court before sentence concerning the subject of additional restitution as a condition of probation. After the sentencing Mr. Crotty paid $15,000 in cash to the probation officer who in turn paid it by checks to Mrs. Barrows and Miss Lewis in the agreed amounts upon their signing of the required releases.

31. Mr. Crotty received as his fee for handling Raymond's matters the $850 which was left in the attaché case. Indeed, had the full $15,850 been necessary to effect restitution, Mr. Crotty would have foregone any immediate compensation for his legal services.

32. Following the court proceedings on the 28th, Raymond and Baker went to a public place known as the Darbury Room, where they were later joined by Judge DeSaulnier. Judge DeSaulnier made reference to telephone conversations he had had with the sitting judge. He also told Raymond that it was a pleasure doing business with him.

33. Raymond, as the respondents argue, was a swindler and a liar. His story in most essentials has received independent corroboration from other sources which are entirely trustworthy. In general outline it had been told on various past occasions (about which there was testimony)

in less complete but substantially consistent fashion.

34. On July 25, 1971, Judge Brogna learned from articles in Boston newspapers that he was the judge who had presided over the Raymond cases and their disposition in September, 1962. On the morning of July 26 he made a number of telephone calls to a number of persons in the office of the Clerk of Courts and of the Probation Officer for Middlesex County to obtain information and copies of records concerning the Raymond cases. On the morning of July 27 he learned the name of the court stenographer assigned to his session of court for the month of September, 1962. He spoke to the stenographer by telephone and asked him to locate his notes on the Raymond cases. The stenographer located them and read them to Judge Brogna at the Suffolk County Court House shortly before noon that day. At the judge's request, the stenographer transcribed the notes and took the transcript to the judge's residence in the late afternoon or early evening of the same day.

35. After hearing the stenographer read his notes, Judge Brogna called Judge DeSaulnier and a judge of a municipal court for a district of Boston. He told each of them what the notes revealed, and invited them to go to his residence late that afternoon when he expected to have a transcript of those notes. The Municipal Court judge in turn called Mr. Monroe Inker, an attorney then representing Baker, told him about the stenographer's notes, and invited him to go to Judge Brogna's residence. At some time between 4:30 and 5:30 P.M. all of the following persons were at Judge Brogna's residence: Judges Brogna and DeSaulnier, the Municipal Court judge, the two Baker brothers, Mr. Inker, and Mr. Joseph Oteri, Mr. Inker's law partner. Judge Brogna told the group what he had done to obtain the records and transcripts on the Raymond cases, and told them of the contents of the transcripts he expected to receive from the stenographer. Shortly thereafter the stenographer delivered the transcripts. In reply to a question by Judge Brogna, one of the Baker brothers said that

they had furnished the bail bonds for Raymond and had received a "bad check" in payment for one of the bonds At that time, although Judge Brogna knew that the Baker brothers had been alleged to have paid a bribe in connection with the Raymond cases, he did not ask them or their lawyers any other questions about any other phase of action or participation by the Baker brothers in the Raymond cases.

36. The stenographer and the Baker brothers left shortly after the delivery of the transcripts. The judges and lawyers remained and went over the transcripts and discussed what should be done with them and the information contained in them. They went out for supper and then resumed their discussions at the law offices of Crane, Inker and Oteri, in Boston. The principal topic of discussion was whether Judges Brogna and DeSaulnier should hold a press conference. Mr. Crotty joined the group briefly and expressed the opinion that they should not hold a press conference. The group ultimately decided that no press conference would be held. At the same meeting the group also discussed what should be done to obtain additional information, particularly what should be done to obtain a copy of Raymond's statements before the Senate committee.

37. The group's decision to hold no press conference was reversed by Judge Brogna early the next day, July 28, as the result of receiving telephone calls from a number of reporters asking him for a statement. He called Judge DeSaulnier and told him he had changed his mind and that he was going to arrange a press conference. He then called Mr. Oteri and asked him to arrange a press conference. Mr. Oteri called the Boston television stations and newspaper offices and arranged for the conference to be held. At the conference Judge Brogna made a statement of what he had done. Mr. Oteri participated in the conference. Copies of the transcript of the proceedings in the Raymond cases were distributed to the newsmen present. Judge DeSaulnier did not participate in the press conference.

INFORMATION IN THE MATTER OF
EDWARD J. DESAULNIER, JR.

The second information (Appendix B) contains a series
of three general allegations. The first of these deals with
Judge DeSaulnier's friendship and gambling activities with
Nathan A. Baker (the younger brother of I. Charles Baker).
It alleges that while the judge was a member of the Bail
Committee of the Superior Court, and Nathan Baker was a
professional bondsman, Nathan Baker lent money to the
judge.

The second general allegation relates to a telephone bill
of $216.68, including at least thirty-three long distance
calls made by Judge DeSaulnier not on official court busi-
ness and paid for by the county of Berkshire after approval
by him. The information sets forth, thirdly, that a real
estate broker's license was issued to Judge DeSaulnier on
September 29, 1969, on his application.

Judge DeSaulnier in large part admits the allegations of
the second information. He claims that his friendship with
Nathan Baker was no more intimate than his friendship
with others, and that this friendship did not impede his
functioning as a member of the Bail Committee. He further
states that no complaint was brought against Nathan Baker
while he was a member of that committee.

Relative to the telephone bill, he states that the tele-
phone in question was available to others, including the
clerk, probation officer, or any person directed to make a
call. He admits the issuance of the real estate broker's
license to him as alleged.

We find as follows:

1. On September 3, 1964, the Chief Justice of the Superior
Court appointed Judge DeSaulnier as one of the members
of the Committee on Bail of the Superior Court. This com-
mittee was charged, in part, with the "supervision of pro-
fessional bondsmen and of the standing commissioners to
admit persons to bail, making periodic reports as required
to the Court."

2. While Nathan A. Baker was a professional bondsman and Judge DeSaulnier was a member of the Committee on Bail, they were intimate social friends. Baker and Judge DeSaulnier often dined and drank together. They frequented places of entertainment outside the Commonwealth and shared expenses. They also traveled together to Las Vegas, Nevada, on "junkets," trips in which certain hotels forego charges for food, drink and entertainment in the expectation that the guests would wager large sums of money.

3. While Nathan A. Baker was a professional bondsman and Judge DeSaulnier was a member of the Bail Committee, Nathan A. Baker lent money to Judge DeSaulnier.

4. During the month of November, 1970, Judge DeSaulnier presided over the session of the Superior Court for the county of Berkshire at Pittsfield, Massachusetts. On December 14, 1970, Judge DeSaulnier approved for payment by the county, in writing, a bill for the use of the telephone in the judge's lobby in the court house. The amount of the bill was $216.68. The county treasurer had called the attention of the judge to these charges in a polite letter. The bill included charges for at least thirty-three long distance telephone calls made by Judge DeSaulnier which were not related to any official business of the Superior Court. These included two calls to a hotel in Las Vegas, and five calls to the office of Nathan A. Baker and his brother, I. Charles Baker, in Boston.

5. On September 29, 1969, on his application, Judge DeSaulnier was issued a real estate broker's license, No. 66684.

ULTIMATE FINDINGS.

Upon the whole record concerning the first and second informations, and on the basis of our subsidiary findings, we conclude that (1) Judge DeSaulnier and I. Charles Baker conspired to influence the ultimate dispositions of Raymond's

cases for a consideration to be paid and, in fact, paid to Baker by Raymond. Judge DeSaulnier received, or expected to receive, some form of consideration or benefit either directly or indirectly from one or both of the Baker brothers for his assistance in the disposition of the Raymond cases; (2) Mr. Crotty represented Raymond at the request of, or in the belief that he was doing a favor for, Judge DeSaulnier. He acted in the belief that if adequate restitution could be effected, it was probable that Raymond would be given no more than a suspended prison sentence. He had no expectation that he would be required to go to trial on the two indictments of Raymond; (3) Judge DeSaulnier, at some time or times in some manner, communicated with Judge Brogna in an attempt to obtain continuances and to influence the disposition of the Raymond cases. Judge Brogna received these communications without objection. The evidence does not permit precise findings concerning the dates, nature, and extent of these communications, or what their influence was. There is no evidence of the receipt by Judge Brogna of any consideration but the evidence raises serious unanswered questions as to the propriety of the disposition and the manner in which the cases were handled by the judge.

On the second information against Judge DeSaulnier alone, we conclude that Judge DeSaulnier's conduct was grossly improper, both as a judge and as a member of the bar.


### DISCUSSION AND RULINGS.

1. In an earlier stage of this proceeding we have discussed several bases of our authority to act in this matter. "The power, authority, and jurisdiction of this court to make the inquiry and to hold hearings rest on at least the following grounds, among others: (a) the inherent common law and constitutional powers of this court, as the highest constitutional court of the Commonwealth, to protect and preserve the integrity of the judicial system and to supervise the

administration of justice; (b) the supervisory powers confirmed to this court by G. L. c. 211, § 3, as amended; (c) the power of this court to maintain and impose discipline with respect to the conduct of all members of the bar, either as lawyers engaged in practice or as judicial officers; and (d) the power of this court to establish and enforce rules of court for the orderly conduct (1) of officers and judges of the courts and (2) of judicial business and administration." *Ante,* 757, 758–759.

We now hold that these same sources give us the power and duty as a matter of judicial administration to prevent a judge of an inferior court who has been guilty of serious judicial misconduct from exercising the powers and duties of his office. Of particular impact is G. L. c. 211, § 3, as amended by St. 1956, c. 707, § 1, wherein it is provided: "[T]he justices of the supreme judicial court shall also have general superintendence of the administration of all courts of inferior jurisdiction, . . . and it may issue such writs, summonses and other processes and such orders, directions and rules as may be necessary or desirable for the furtherance of justice, the regular execution of the laws, the improvement of the administration of such courts, and the securing of their proper and efficient administration." Such a power has been found to exist in Michigan under constitutional provisions similar to our statutory provision. *In re Graham.* 366 Mich. 268 (1962). *Ransford* v. *Graham,* 374 Mich. 104 (1964). We have already ruled that we may impose discipline on members of the bar who are also judges. See *ante,* 757, 759.

Our powers of supervision outlined above we propose to exercise with deference to the provisions in the Constitution of the Commonwealth which impose upon the Governor and the General Court primary responsibility for removal of judges. These provisions include Part II, c. 3, art. 1, governing removal by address, and Part II, c. 1, § 3, art. 6, and Part II, c. 1, § 2, art. 8, dealing with impeachment.

It has been argued that this supervision constitutes interference with the independence of the judiciary which the drafters of our State Constitution were so zealous to establish in art. 29 of the Declaration of Rights. It is there stated, "It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit." This court is fully cognizant of its responsibility not to take action to impinge on this freedom so vital to the proper functioning of democracy. But judges who do not abide by those high and well recognized standards of personal and judicial conduct to which they must be held cannot employ the argument of judicial independence as a shield when questionable practices on their part are challenged.

2. What then are these standards? It is unfortunate that we are faced with a case, the first of its type in the history of the Superior Court, in which they must be defined.

Every Massachusetts judge should be aware, as a matter of tradition and instinct, that there exist standards governing his judicial conduct. Some of these standards, such as the duty of honesty, fairness, impartiality, integrity of decision and reasoning, independence, and diligence, hardly need to be stated. These are affirmative standards and duties which, if observed, go far to preserve the courts from scandal or corruption. There has been felt over the years, however, the need of specific definition of what conduct is proper for a judge. In 1924, the American Bar Association adopted Canons of Judicial Ethics prepared by a committee led by Chief Justice William Howard Taft. These Canons merely put into writing what had been accepted earlier. Among other propositions, they stated, "A judge's official conduct should be free from impropriety and the appearance

of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach." (Canon 4.) It was further said in those Canons, in part, that a "judge should avoid giving ground for any reasonable suspicion that he is utilizing the power or prestige of his office to persuade or coerce others to patronize or contribute . . . to the success of private business ventures . . . . He should, therefore, not enter.into such private business, or pursue such a course of conduct, as would justify such suspicion . . . nor should he enter into any business relation which, in the normal course of events reasonably to be expected, might bring his personal interest into conflict with the impartial performance of his official duties." (Canon 25.)

In the last few years, an American Bar Association Committee, headed by former Chief Justice Roger J. Traynor of California, has proposed a new set of Canons of Judicial Ethics. These have not yet been officially adopted and, indeed, may be modified to some extent before final approval. Nevertheless, in general direction and content, they indicate the strong consensus within the legal profession that, for the future, judges should be held to more definite and high standards of judicial conduct and private behavior and practices than in the past. The proposed Canons declare (Canon 1) that a "judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of judicial conduct so that the integrity and independence of the judiciary may be preserved." To this end the proposed Canons go on to provide that a full time judge should "refrain from any financial and business dealings that tend to reflect adversely upon his impartiality or integrity, or that interfere with the proper performance of his judicial duties" (Proposed Canon 4 [c] [2]). The proposed Canons also would impose in the future definite restrictions against judges holding offices in business organizations and taking an active role in business

management (proposed Canon 4 [c] [1]), and serving as fiduciaries except in family matters (proposed Canon 4 [d]). In these respects, the proposed Canons attempt, by limiting practices not unusual or expressly prohibited in the past, to avoid possibility of reasonable public criticism and misunderstanding.

Proposed new Canon 5 is of particular importance and has special application to the facts before us: "A judge should show respect for and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A judge should not allow his family, social, or business relations or friendships to influence his judicial conduct or judgment. He should not knowingly permit others to convey the impression that they have special influence with him, or lend the prestige of his office to advance a private business interest." The Commentary to this Canon goes on to say that "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges. The judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen, and he should do so freely and willingly."

3. There can be little doubt that, measured by the general standards of new Canon 5, which directly reflect long-existing and well recognized principles of judicial conduct, Judge DeSaulnier's conduct as shown by our findings falls far short of promoting "public confidence in the integrity and impartiality of the judiciary."

4. We have mentioned other aspects of the proposed Canons so fully because it was argued to us that Judge DeSaulnier's application for, and possession of, a real estate broker's license did not contravene G. L. c. 212, § 27, as appearing in St. 1969, c. 845, § 3, and did not constitute the practice of law. It was suggested to us also that it was not

improper for full time judges to serve as directors of banks and commercial corporations and to engage actively in general business. There is no evidence that Judge DeSaulnier has made any use of his broker's license, but his possession of the license gives an impression of an improper intention to engage for others generally in real estate transactions and activities. Serving as a broker for others for compensation, we hold, would violate the spirit, if not the letter, of § 27. Section 27 provides: "Such [Superior Court] justices shall devote their entire time during business hours to their respective duties and shall not, directly or indirectly, engage in the practice of law."

5. We reach the following conclusions on the basis of G. L. c. 212, § 27, and the various Canons to which we have alluded. Fairly read, the statute contemplates that a Massachusetts full time judge should give full time to his position. This is also the thrust of the Canons. This means that full time judges of any Massachusetts court should not serve as bank directors or directors of other commercial ventures or as real estate brokers. Hitherto it has not been stated officially that judges should not serve as fiduciaries except for the estate, trust or person of a member of his family, and then only if such service will not interfere with his judicial duties. We now express the view that the proposed Canon 4 constitutes a proper guide henceforth for full time judges. In so stating we, of course, exclude activities on charitable boards and the like. In short, when one chooses to become a full time Massachusetts judge he chooses at the same time to sacrifice the potential income to be derived from legal and business activities proper for a lawyer but improper for a judge.

It need hardly be stated that he may not be a social intimate of bail bondsmen whose conduct he is charged with regulating, or that he may not borrow money from them any more than he may from lawyers appearing before him. Furthermore, public gambling and being a judge are completely incompatible.

6. We emphasize what should not need to be stated at all. Any attempt to tamper with a judicial disposition constitutes a vicious attack on the dispensation of even-handed justice. It does not matter whether the interference comes from a member of the bar, another judge, an elected or appointed official, or from a member of the general public. It does not matter whether it involves a traffic ticket, a probate disposition, or a felony. It was also grossly improper for such communication to have been made, and for the recipient of the communication to have tolerated any approach on such matters even from or in behalf of a friend or brother judge. Any such attempts in the future should be immediately reported by the judge so approached to the Chief Justice of his court.

7. At the observation of the centennial of the Superior Court in 1959, by which time 164 judges had served that court throughout a century without a breath of scandal, reference was made to the requirement of the Massachusetts judge as stated by Rufus Choate at the Constitutional Convention in 1853. Said he, "He must possess the perfect confidence of the community, that he bear not the sword in vain." [1] This has been the tradition in Massachusetts. We intend to keep it so.

8. In the light of the above findings and discussion we rule as follows:

1. Judge DeSaulnier's conduct in the Raymond case (the subject of the first information) and his admitted conduct, both in personal associations and activity as charged in the second information (particularly his conduct in borrowing money from a bondsman whom it was his duty to supervise), have made him unfit to continue either as a judge or as a member of the bar. It is therefore ordered as a matter of judicial administration that he shall not exercise the powers and duties of a Superior Court Judge until further order of

[1] 44 Mass. L. Q. (No. 2) 33.

this court, and that a separate order of disbarment shall be entered.

2. Judge Brogna's activity in connection with the Raymond cases deserves and requires censure. We do hereby censure him.

3. Some aspects of Judge Brogna's conduct in July, 1971, after he was identified in the press as the judge who presided over the Raymond cases, call for attention. He had the unquestioned right to gather whatever information was available on the cases. In the circumstances existing on July 28, 1971, it was appropriate for him to release to the press a copy of the stenographic transcript of the court proceedings in the cases. We consider, however, the holding of a press conference like that in fact held on that date to be of highly questionable propriety on the part of all participants.

4. The entire record of the proceedings, together with the transcript of testimony, is to be transmitted to the Governor and the General Court for such action as may be deemed appropriate.

*So ordered.*