IN RE HONORABLE CHARLES E. KADING, Judge of County Court, Branch No. 1, Jefferson County, Wisconsin.*

*No. 75–154. Argued September 2, 1975.—Decided November 25, 1975.*
(Also reported in 235 N. W. 2d 409, 238 N. W. 2d 63 and 239 N. W. 2d 297.)

* Motion for rehearing denied, without costs, on February 3, 1976. Mr. Justice ROBERT W. HANSEN dissents.

510

512

Briefs were filed in support of the Hon. Charles E. Kading by *Richard L. Cates, John H. Bowers, Michael S. Weiden* and *Lawton & Cates,* all of Madison, with oral argument by *Richard L. Cates.*

Briefs were filed in support of the validity of Rule 17 of the Code of Judicial Ethics by *Bronson C. La Follette,* attorney general, and *Betty R. Brown,* solicitor general, with oral argument by *Ms. Brown.*

WILKIE, C. J. The matter before us concerns the validity of Rule 17 of the Judicial Code of Ethics which this court adopted on June 28, 1974, and which requires an annual financial report listing assets and liabilities of each state judge, owned by the judge, by his spouse, or by his legal dependents. Judge Kading filed his financial report (for assets and liabilities as of December 31, 1974) on March 5th, in advance of the March 15, 1975, deadline. All items were completed, with the exception of Item 10, which called for disclosure of assets. At Item 10 Judge Kading wrote the following words:

"Sorry. I decline to furnish this information at this time. At such time as any case is assigned to me in which I might conceivably be prejudiced because of any asset owned by myself, wife, or any relative, dependent or otherwise, the situation will be fully disclosed to the Administrator of Courts."

On March 25, 1975, the supreme court directed the Judicial Commission to investigate Judge Kading's failure to comply with Rule 17 and to take action on any violation it might find.

Commission Chairman Francis J. Wilcox informed Judge Kading by letter of April 24, 1975, that the report as returned constituted a violation of Rule 17. Chairman Wilcox also stated that the commission proposed to report this violation to the supreme court and to recommend appropriate discipline, but that before this was done, Judge Kading would be granted a hearing if he desired. On May 9, 1975, Judge Kading replied by letter to the executive secretary of the commission that the reason he had failed to comply was that the asset-disclosure requirement was, in his opinion, unconstitutional on a number of specific grounds. Judge Kading also rejected the opportunity for a hearing.

On June 11, 1975, the Judicial Commission made its formal determination in this matter. It found that Judge Kading had not filed a complete financial report, and concluded that this was a violation of Rule 17. The commission recommended that the supreme court take whatever appropriate action would insure Judge Kading's compliance with Rule 17. The supreme court, on June 16, 1975, ordered Judge Kading to comply with Rule 17 on or before June 27, 1975, or show cause why he should not be held in contempt of the supreme court and why other appropriate action should not be taken by the court. By letter, dated June 19, 1975, Judge Kading answered that he still refused to comply because, in his view, Rule 17 was unconstitutional. On June 24, 1975, the supreme court ordered that a supreme court

hearing be held on September 2, 1975, on the question of the constitutionality of Rule 17, and on the question of which sanctions were appropriate for violation of Rule 17.

The following issues are raised in this original proceeding:

1. Did this court have the power to adopt and enforce the Code of Judicial Ethics in 1967, and the 1974 amendment, Rule 17?

2. Is Rule 17, which provides for mandatory disclosure of assets, an unconstitutionally overbroad intrusion into the private economic affairs of judges?

3. Is Rule 17 invalid as a legislative act?

4. Does Rule 17 establish a prohibited additional qualification for office?

5. Is Rule 17 a fundamentally unfair deprivation of due process?

We hold that the court had authority to adopt the Code of Judicial Ethics and Rule 17 of that code; that Rule 17 is valid in all respects as against all of the challenges made by Judge Kading; that this court has the authority to enforce Rule 17. We order Judge Kading to comply with the provisions of Rule 17 and reserve jurisdiction on this entire proceeding, pending that compliance.

*Authority to adopt and enforce code.*

The Code of Judicial Ethics was adopted on November 14, 1967,[1] after (1) nearly two years of careful study by a special committee created by this court to study the question of whether this court should adopt such a code and to recommend provisions of the code; (2) unanimous recommendation by the study committee consisting of six trial judges and three attorneys both that this court has authority to adopt a code of ethics and proposing a

[1] *Code of Judicial Ethics* (1967), 36 Wis. 2d 252, 153 N. W. 2d 873, 155 N. W. 2d 565.

detailed Code of Judicial Ethics; and (3) over one year of study of these reports by this court with a public hearing on September 12, 1967. In a unanimous order entered by the court, in which the code was promulgated,[2] we declared:

"We hold this court has an inherent and an implied power as the supreme court, in the interest of the administration of justice, to formulate and establish the Code of Judicial Ethics accompanying this opinion. It governs judicial acts of a judge in his official capacity and certain personal conduct which interferes or appears to interfere with the proper performance of his judicial conduct. This power, inherent in the supremacy of the court and implied from its expressed constitutional grants of supervisory power, embraces all members of the judiciary including members of this court not only because they are lawyers but also because they are judicial officers in a court system constituting the judicial branch of the state government with a solemn duty to perform their judicial duties well."[3]

Effective January 1, 1972, a Judicial Commission was created by the court to enforce the code.[4] Certain rules of procedure for the commission also became effective on that date.[5] More detailed rules of procedure for the commission were later adopted by this court, effective January 1, 1973.[6] The code was amended by order of this court on June 28, 1974, in order to add Rule 17.[7]

Judge Kading challenges this court's authority to adopt the original 1967 Code of Judicial Ethics and the additional provisions of Rule 17. We reject this attack on the fundamental authority of this court. Both the adoption of the code and the later adoption of Rule 17 are

---

[2] *Id.*

[3] *Id.* at page 254.

[4] *Code of Judicial Ethics* (1972), 52 Wis. 2d vii.

[5] *Id.* at pages x, xi.

[6] *Judicial Comm. Rules of Procedure* (1973), 57 Wis. 2d vii.

[7] *In the Matter of the Amendment of Code of Judicial Ethics* (1974), 63 Wis. 2d vii.

actions of this court performed under its inherent power to function as the supreme court and also performed in carrying out the function of superintending control as expressly set forth in art. VII, sec. 3, of the Wisconsin Constitution, as follows:

"The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state; but in no case removed to the supreme court shall a trial by jury be allowed. The supreme court shall have a general superintending control over all inferior courts; it shall have power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and other original and remedial writs, and to hear and determine the same."

Inherent judicial power has been explained by this court in the following terms:

". . . when the people by means of the constitution established courts, they became endowed with all judicial powers essential to carry out the judicial functions delegated to them. . . . But the constitution makes no attempt to catalogue the powers granted. . . . These powers are known as incidental, implied, or inherent powers, all of which terms are used to describe those powers which must necessarily be used by the various departments of government in order that they may efficiently perform the functions imposed upon them by the people."[8]

In another case[9] this court amplified its description of this inherent judicial power as follows:

". . . The constitution does not speak of the powers of courts. It does speak of their jurisdiction, but not of their powers. In the same manner the constitution speaks of trial by jury, but it does not attempt to define the term 'jury.' It is settled that the trial by jury contem-

[8] *State v. Cannon* (1929), 199 Wis. 401, 402, 226 N. W. 385. *See also: State v. Cannon* (1928), 196 Wis. 534, 536, 221 N. W. 603.

[9] *In re Cannon* (1932), 206 Wis. 374, 392, 393, 240 N. W. 441.

plated by the constitution was the trial by jury known to the common law. *Malinowski v. Moss,* 196 Wis. 292, 220 N. W. 197. So when the term 'court' is used in the constitution it is plain that the framers had in mind that governmental institution known to the common law possessing powers characterizing it as a court and distinguishing it from all other institutions. This power has been referred to by all legal scholars and writers as the inherent power of courts. . . . No one entertains the thought, whether it be called inherent or implied, that it is a power which transcends the constitution. It is a power which may be taken away by the constitution, just as all courts may be abolished by the constitution. No mere creature of the people can rise above the people in importance, dignity, or power. The statement in the opinion that it was a power that existed independent of the constitution merely meant that it was a power which inhered in the courts established by the constitution and existed by reason of their creation, independent of any affirmative power expressly conferred by the constitution."

The function of the judiciary is the administration of justice, and this court, as the supreme court within a statewide system of courts, has an inherent power to adopt those statewide measures which are absolutely essential to the due administration of justice in the state.

The Code of Judicial Ethics is one such measure. One of its purposes is to eliminate the possibility that conflicts of interest will interfere with the fair and impartial administration of justice. The code primarily regulates judicial acts of a judge in his official capacity, and no one can claim that such official acts do not relate to the due administration of justice in the state. The code also contains binding rules which regulate certain personal conduct of Wisconsin judges. The reason for this is that certain personal conduct, such as investment in enterprises involved in litigation, is likely to interfere (or have the appearance of interfering) with the proper performance of the judge's official duties. As such, it directly affects the due administration of justice, and

so is a proper subject for the exercise of this court's inherent power.

Judge Kading argues that this court's inherent power is limited to regulation of attorneys[10] and to the procurement of that which is physically necessary to the operation of its courtroom.[11] The fundamental misconception of this argument is that it would limit the exercise of inherent power by this court to whatever has been done in the past. The inherent power of this court is shaped, not by prior usage, but by the continuing necessity that this court carry out its function as a supreme court. Even the passage which Judge Kading cites from *In re Cannon*[12] to support his restrictive interpretation refers to regulation of attorneys as only "a *constituent* element" and "a *part* of the inherent power of the court" (emphasis supplied).

In addition to the inherent power of this court, we find an additional source of authority for this court's promulgation of the Judicial Code and of Rule 17 in the power which is reasonably implied from this court's express constitutional authority to exercise " 'a general superintending control over all inferior courts.' " This power of superintending control is "unlimited in extent . . . undefined in character . . . [and] unsupplied with means and instrumentalities."[13] That this is "a clear, unequivocal grant of power"[14] has been recognized from the earliest days of Wisconsin law. Mr. Justice ROUJET MARSHALL, after a painstaking survey of this power concluded in 1908 that it is "not limited other than by the

[10] *In re Integration of Bar* (1946), 249 Wis. 523, 25 N. W. 2d 500; *In re Integration of Bar* (1956), 273 Wis. 281, 77 N. W. 2d 602.

[11] *See, for example: In re Janitor of Supreme Court* (1874), 35 Wis. 410.

[12] (1932), 206 Wis. 374, 396, 397, 240 N. W. 441.

[13] *Attorney General v. Blossom* (1853), 1 Wis. 277 (*317), 283 (*325).

[14] *Ibid.*

necessities of justice" and that it necessarily includes "all . . . means applicable thereto and all power necessary to make such . . . means fully adaptable for the purpose."[15] The superintending power is as broad and as flexible as necessary to insure the due administration of justice in the courts of this state.

Judge Kading argues that, since the superintending power has been used in the past only to control courts in matters between parties to a litigation, it cannot be extended to other situations. This misconceives the nature of the superintending power. If this power were strictly limited to the situations in which it was previously applied, it would cease to be superintending, since this word definitely contemplates ongoing, continuing supervision in response to changing needs and circumstances. The power of superintending control should not be ossified by an unduly restrictive interpretation of its extent.

Judge Kading relies upon *Petition of Heil*[16] for his interpretation of the superintending power:

". . . it is a well-established rule that superintending control will be exercised only at the behest of a party to a proceeding in an inferior court . . . .
" . . .
" . . . the purpose of this jurisdiction is the protection of a person in his rights as litigant."

Yet adoption of the code fits within this purpose. The rights of all litigants are protected by the code, since it insures integrity and impartiality in the judiciary. If the superintending power can be used to protect particular parties to a particular litigation, then surely it can be used to protect the rights of litigants in general. Indeed, the constitutional grant of this power is made in general terms. It cannot be said that exercise of this

---

[15] *State ex rel. Umbreit v. Helms* (1908), 136 Wis. 432, 462, 118 N. W. 158.
[16] (1939), 230 Wis. 428, 430, 433, 284 N. W. 42.

power necessarily depends upon a specific petition from a specific litigant.

Judge Kading also relies upon *State ex rel. Department of Agriculture v. Aarons:*[17]

> ". . . The superintending power is over the courts and not over the person who happens to be judge of the court acting in an administrative capacity."

But this case, involving denial of a petition to appoint appraisers, provides no support for Judge Kading's argument. As the court in *Aarons* said, a "judge of [a] court acting in an administrative capacity" might as well not be a judge. He could just as well have been a city mayor or chairman of a county board. The point was that he was not in any way acting *judicially*, and thus was beyond the reach of the superintending power. Yet enforcement of the code aims at insuring that, when a judge acts judicially, he acts impartially and ethically. Certain rules relate to aspects of a judge's personal life, but only insofar as they might affect his *judicial* performance.

The final case cited by Judge Kading is *Seiler v. State:*[18]

> ". . . the power of superintending control . . . has to do only with controlling inferior courts . . . ."

Again, the argument is that the words "inferior courts" cannot include any personal conduct of a judge. However, when a judge acts nonjudicially but in a way that might influence judicial performance, he directly affects the administration of justice in "inferior courts." As such he is within the scope of the superintending power.

Judge Kading also argues that the adoption of a code of ethics for judges is a matter for the legislature alone to enact. In addition to our determination here that (1)

---

[17] (1946), 248 Wis. 419, 423, 22 N. W. 2d 160.
[18] (1901), 112 Wis. 293, 300, 87 N. W. 1072.

this court has the inherent authority to adopt such a code as the supreme court performing its duties under our Wisconsin system of government, and (2) this court has the authority to adopt the code under its constitutional authority of superintending control over inferior courts, it must be noted that the legislature itself in recent years has specifically chosen not to adopt a code of ethics for judges. Thus in the 1973 legislative session, in enacting as part of the 1973 budget law (ch. 90) a code of ethics for state officials,[19] the legislature specifically exempted the judiciary.[20]

Judge Kading argues that the constitutional means of removal[21] are exclusive in the sense that no other sanctions short of removal by the prescribed means can be imposed upon a sitting judge. For this proposition he relies upon the following dicta:

"The constitution having prescribed the particular method by which a . . . judge may be removed . . . the rule of construction *expressio unius est exclusio alterius* is peculiarly applicable to this situation."[22]

"It is a well-established principle of constitutional law that where . . . methods of removal are provided by the constitution, the constitution in those respects is exclusive, and it is beyond the power of the legislature . . . to provide for removal in other than the constitutional method."[23]

These statements mean only that, when a judge is *removed*, he must be removed by the constitutional method. They do not say that sanctions short of removal are con-

---

[19] Secs. 19.41–19.50, Stats.

[20] Sec. 19.42 (8), Stats.

[21] The constitution means of removal are impeachment (art. VII, sec. 1), address (art. VII, sec. 13), and recall (art. XIII, sec. 12).

[22] *State ex rel. Kleist v. Donald* (1917), 164 Wis. 545, 551, 160 N. W. 1067.

[23] *State ex rel. La Follette v. Kohler* (1930), 200 Wis. 518, 553, 228 N. W. 895.

stitutionally defective. Also, in those jurisdictions where censure, contempt, and suspension have been employed as sanctions by the judiciary, there was a constitutional provision vesting in the legislature the power to remove judges.[24] In spite of this, other supreme courts have held that they could impose these other sanctions short of outright removal.[25] In each case, the supreme court involved based its decision upon its responsibility as a constitutionally charged superintendent and upon the proposition that it was unsound jurisprudence to refuse to exercise judicial power where there was an established need for it and no explicit constitutional barrier to its exercise.

As to Rule 17, Judge Kading's attack goes not only to the basic lack of authority in this court to adopt a judicial code, including Rule 17, but also includes the assertion that by requiring public disclosure of his personal assets, Rule 17 invades matters of such a private nature that it is beyond "the ambit of the power of this court to promulgate."[26]

However, this argument ignores the recent erosion of confidence in and respect for public officials which has been so detrimental to our system of government. No one can deny that there has been a growing skepticism in regard to the integrity and impartiality of public officials at all levels. The legislature of this state has attempted to reverse this trend by enacting a Code of Ethics for Public Officials[27] which includes a financial

[24] *In re Mussman* (1972), 112 N. H. 99, 289 Atl. 2d 403; *Ransford v. Graham* (1964), 374 Mich. 104, 131 N. W. 2d 201; *In re Graham* (1962), 366 Mich. 268, 114 N. W. 2d 333 (suspension); *In re Assignment of Huff* (1958), 352 Mich. 402, 91 N. W. 2d 613 (contempt); *Judges of Cedar Rapids Municipal Court* (1964), 256 Iowa 1135, 130 N. W. 2d 553; *In re Municipal Court of Cedar Rapids* (Iowa 1971), 188 N. W. 2d 354 (censure).

[25] *See especially: In re Mussman, supra,* footnote 24, at pages 405, 406; *Ransford v. Graham, supra,* footnote 24, at page 202.

[26] *Code of Judicial Ethics, supra,* footnote 1, at page 253.

[27] *Supra,* footnote 19.

disclosure requirement.[28] As noted, the judiciary is specifically exempted from the coverage of this statutory code,[29] in a manner consistent with the doctrine of separation of powers. This legislative action follows this court's promulgation in 1967 of the comprehensive Code of Judicial Ethics. It should be noted that this code goes well beyond the legislatively prescribed Code of Ethics for Public Officials in general by requiring that a judge "shall not participate in any matter in which he has a significant financial interest."[30]

Rule 17 is a reasonable additional regulation promulgated by this court as a response to the compelling need to maintain public confidence in the judiciary. This need is not merely a passing whim of a citizenry temporarily disillusioned by recent national events. It is a continuing necessity, as this court has recognized:

". . . A prejudiced judge is abhorrent to settled notions of justice, and nothing tends to bring courts or the administration of justice into disrespect more than the spectacle of a prejudiced judge sitting in judgment upon the rights of litigants. A lack of confidence in the integrity of courts rocks the very foundations of organized society, promotes unrest and dissatisfaction, and even encourages revolution."[31]

Since such public confidence is absolutely crucial to the due administration of justice, the adoption of Rule 17 was well within the scope of this court's inherent and supervisory powers.

We therefore conclude that the adoption and enforcement by this court of a strong code of ethics in 1967, with the sound financial disclosure rule of 1974, is an appropriate action taken by the judiciary to keep its own

---

[28] Sec. 19.44, Stats.

[29] *Supra*, footnote 20.

[30] *Code of Judicial Ethics, supra*, footnote 1, at page 259.

[31] *In re Stolen* (1927), 193 Wis. 602, 620, 214 N. W. 379, 216 N. W. 127.

house in order so as to better assure the effective, fair and impartial administration of justice in our Wisconsin state courts.

### Overbroad invasion of privacy.

Judge Kading argues that Rule 17 is an unconstitutionally overbroad intrusion into his private economic affairs. The threshold question on this inquiry must be whether Judge Kading, an elected public official, has a fundamental constitutional right to economic privacy, because it is only the existence of a fundamental right which triggers the further requirement that the enactment not sweep too broadly into this area of fundamental freedom.[32]

A fundamental freedom from intrusion by government into one's personal privacy has been found to lie in the penumbra of various federal constitutional provisions. Among these provisions are freedom of association under the first amendment, freedom from unreasonable search and seizure under the fourth amendment, the right against self-incrimination of the fifth amendment, the retained rights of the people under the ninth amendment, and the due process clause of the fourteenth amendment.[33]

---

[32] *Griswold v. Connecticut* (1965), 381 U. S. 479, 485, 497, 85 Sup. Ct. 1678, 14 L. Ed. 2d 510; *NAACP v. Alabama* (1964), 377 U. S. 288, 307, 84 Sup. Ct. 1302, 12 L. Ed. 2d 325; *Shelton v. Tucker* (1960), 364 U. S. 479, 488, 81 Sup. Ct. 247, 5 L. Ed. 2d 231.

[33] *Griswold v. Connecticut, supra,* footnote 32, at pages 484, 487–499 (GOLDBERG, J., concurring); 499 (HARLAN, J., concurring); 502 (WHITE, J., concurring); *see also: Camara v. Municipal Court* (1967), 387 U. S. 523, 539, 87 Sup. Ct. 1727, 18 L. Ed. 2d 930; *Mapp v. Ohio* (1961), 367 U. S. 643, 656, 81 Sup. Ct. 1684, 6 L. Ed. 2d 1081, 84 A. L. R. 2d 933; *Boyd v. United States* (1886), 116 U. S. 616, 630, 6 Sup. Ct. 524, 29 L. Ed. 746.

In *Griswold v. Connecticut*,[34] the court held that the right to marital privacy warranted overturning a state law forbidding sale of contraceptives to married persons. In *Roe v. Wade*[35] the court, in declaring the Texas abortion statute unconstitutional, held that the right to privacy included a qualified right to terminate pregnancy. These decisions are limited in carving out the area of privacy. They indicate only that intimate personal and familial matters, having to do with procreation, are within the protected zone of privacy. Protection of the ownership of property is quite another matter. Neither *Griswold,* nor *Wade,* nor any other supreme court case, holds that the right to privacy extends to freedom from disclosure of one's assets and liabilities.

One additional factor is most important in this case. It is the fact that Judge Kading is not solely a private citizen. Judge Kading is by voluntary choice a public official. While public officials, of course, do not waive their constitutional rights,[36] they are nevertheless set apart from other members of society in terms of certain rights, as the law on libel makes clear.[37] One who willingly puts himself forward into the public arena, and accepts publicly conferred benefits after election to public office, is legitimately much more subject to reasonable scrutiny and exposure than a purely private individual.

For all of these reasons, we conclude that it is extremely doubtful that a public official has a fundamental constitutional right to economic privacy.

[34] *Supra*, footnote 32.

[35] (1973), 410 U. S. 113, 93 Sup. Ct. 705, 35 L. Ed. 2d 147, rehearing denied, 410 U. S. 959, 93 Sup. Ct. 1409, 35 L. Ed. 2d 694.

[36] *Bagley v. Washington Township Hospital District* (1966), 65 Cal. 2d 499, 55 Cal. Rptr. 401, 421 Pac. 2d 409.

[37] *See: New York Times Co. v. Sullivan* (1964), 376 U. S. 254, 84 Sup. Ct. 710, 11 L. Ed. 2d 686.

Even if one assumes that such a fundamental right exists, Rule 17 can still meet the stricter constitutional test applied to laws that impinge upon fundamental rights. This test, as enunciated in various supreme court cases,[38] is that the law must arise out of a compelling governmental purpose, which cannot be achieved by any means less restrictive of constitutional freedoms.

There are compelling public interests behind the adoption of Rule 17. The first is to assure the impartiality and honesty of the state judiciary. The second is to instill confidence in the public in the integrity and neutrality of their judges. The third is to inform the public of economic interests of judges which might present a conflict of interest. Taken together, these paramount public interests are enough to subordinate the assumed right of a public official to be free from compulsory economic disclosure.

Yet compelling public interests are not enough to validate Rule 17, if the means chosen are not sufficiently narrow. The means chosen must not merely bear a rational relation to the legitimate end; they must be clearly necessary to the attainment of that end. Any overbreadth which sweeps unnecessarily into the area of protected freedoms is fatal to the validity of such a law.[39]

Judge Kading argues that Rule 17 is overbroad in that it requires him to disclose all of his assets, and not just those which might be relevant to the performance of his official duties. The problem which this position presents is that it would be impossible to devise an objective scheme of relevant and nonrelevant judicial assets. The only practical way that such a limitation could be writ-

---

[38] *Griswold v. Connecticut, supra,* footnote 32, at pages 485, 497; *NAACP v. Alabama, supra,* footnote 32, at page 307; *Shelton v. Tucker, supra,* footnote 32, at page 488.

[39] *NAACP v. Alabama, supra,* footnote 32.

ten into Rule 17 would be for each judge to make a personal determination as to whether a particular asset is relevant to a particular case. But how would any interested litigant know whether a judge owned a particular asset that was relevant to a specific case? The disclosure pursuant to Rule 17 is an entirely reasonable regulation to insure the achievement of the basic aims of Rule 17.

Judge Kading also argues that Rule 17 is overbroad in that it requires him to disclose the assets of his spouse and legal dependents. Of course, without this provision, a judge could transfer record title of questionable assets to his spouse or dependents and escape exposure under Rule 17. Also, a judge would be just as likely to lose his impartiality if his spouse or children owned assets which would be materially affected by the outcome of a case, as he would if he himself owned those assets. It is entirely necessary to achieve the purposes of Rule 17 that reports include the assets of spouse and dependents.

Finally, in regard to overbreadth, it should be noted that Rule 17 does contain limiting provisions designed to eliminate disclosure of those financial details not necessary to the achievement of the purposes of Rule 17. Household and personal effects, automobiles, and recreational equipment need not be listed. Assets of less than $100 value are exempted. Most importantly, neither the dollar value nor the quantity of the assets need be disclosed.[40]

While this is a case of first impression in this jurisdiction, other states have decided similar cases. In the 1970 case of *City of Carmel-By-The-Sea v. Young*,[41] the California Supreme Court found that state's first attempt at a financial disclosure law to be an overbroad intrusion into the privacy of public officials. Over a vigorous dis-

---

[40] *In the Matter of the Amendment of Code of Judicial Ethics, supra*, footnote 7.

[41] (1970), 2 Cal. 3d 259, 85 Cal. Rptr. 1, 466 Pac. 2d 225.

sent, the court found that "the protection of one's personal financial affairs and those of his (or her) spouse and children against compulsory public disclosure is an aspect of the zone of privacy."[42] Given this fundamental right, the court held unconstitutional a full disclosure law which did not distinguish between relevant and nonrelevant assets. However, the California law included all state *and* local officials, in whatever capacity they served, and whatever their responsibility. The court specifically stated that a full disclosure law aimed solely at legislators or others in sensitive positions might meet with its approval.[43]

Cases in other jurisdictions have rejected the rationale of *City of Carmel-By-The-Sea*. In two cases the Illinois Supreme Court questioned the notion of a zone of economic privacy for public officials, and held that, whatever the status of economic privacy, the government had a compelling interest in the disclosure laws at issue and that they were narrowly enough drawn to escape constitutional infirmity. In 1972, in *Stein v. Howlett*,[44] the court upheld the Governmental Ethics Act, which required full disclosure of assets by most Illinois public officials. In 1974, in *Illinois State Employees Asso. v. Walker*,[45] the court found constitutional a full financial disclosure requirement imposed by order of the governor upon officials of the executive branch. Like Rule 17, the order in question required full disclosure of the assets of one's spouse and members of one's family living at home. In 1974, in *Fritz v. Gorton*,[46] the Washington Supreme Court rejected a constitutional challenge to that

---

[42] *Id.* at page 268.

[43] *Id.* at page 272. A revised financial disclosure law, which distinguished between relevant and nonrelevant assets, was subsequently upheld by the California Supreme Court in *County of Nevada v. MacMillen* (1974), 11 Cal. 3d 662, 114 Cal. Rptr. 345, 522 Pac. 2d 1345.

[44] (1972), 52 Ill. 2d 570, 289 N. E. 2d 409.

[45] (1974), 57 Ill. 2d 512, 315 N. E. 2d 9.

[46] (1974), 83 Wash. 2d 275, 517 Pac. 2d 911.

state's full financial disclosure law for public officials. In addition to full disclosure, this law mandated disclosure of the assets of the official's immediate family.

In *Stein, Walker,* and *Fritz* those who challenged full financial disclosure claimed that such a requirement was unconstitutionally overbroad. The argument regarding overbreadth was in those cases the same as the overbreadth argument made here by Judge Kading. In all three cases this argument was rejected.[47] Judge Kading seeks to distinguish *Stein, Walker,* and *Fritz* on the ground that the financial disclosure laws there in question were passed, respectively, by a legislative enactment pursuant to constitutional authorization, an executive order, and a popular initiative. However, the nature of the state institution or source of state power is irrelevant to the question of overbreadth. If the law sweeps too broadly and impinges upon a fundamental right, then it is unconstitutional, no matter how it was passed. Thus the fact that Rule 17 was adopted by order of this court makes it no more susceptible to a claim of overbreadth than the enactments at issue in *Stein, Walker,* and *Fritz.*

Finally, both *Stein* and *Fritz* were appealed to the United States Supreme Court, and the appeals later dismissed, in unanimous decisions, for want of a substantial federal question.[48] Such a dismissal is a decision on the merits.[49] Thus, it must be concluded that the weight of authority is against the proposition that full financial disclosure laws for public officials are unconstitutionally overbroad.

---

[47] *Stein v. Howlett, supra,* footnote 44, at page 578; *Illinois State Employees Asso. v. Walker, supra,* footnote 45, at page 526; *Fritz v. Gorton, supra,* footnote 46, at page 300.

[48] *Stein v. Howlett* (1973), 412 U. S. 925, 93 Sup. Ct. 2750, 37 L. Ed. 2d 152; *Fritz v. Gorton* (1974), 417 U. S. 902, 94 Sup. Ct. 2596, 41 L. Ed. 2d 208.

[49] *Ohio ex rel. Eaton v. Price* (1959), 360 U. S. 246, 247, 79 Sup. Ct. 978, 3 L. Ed. 2d 1200.

*Legislative act.*

Judge Kading asserts that it was improper for this court to adopt Rule 17 because that rule is a legislative act. This is merely a conclusory assertion which obscures the real question, which is whether this court has the authority to promulgate the Code of Judicial Ethics and Rule 17. We have answered this question in the affirmative. Moreover, as we have also noted, the legislature apparently did not agree that detailed regulation of judicial ethics was proper legislative action since it specifically exempted the judiciary from the Code of Ethics for Public Officials.[50]

Judge Kading's reliance on *Lathrop v. Donohue*[51] to support his argument is completely misplaced. That case held only that an order of this court creating an integrated bar "had the characteristics of legislation" and was thus reviewable by the United States Supreme Court under a federal statute authorizing review where, *inter alia,* "the validity of a [state] statute" was drawn into question. Indeed, the United States Supreme Court in that case upheld the validity of this court's order, in spite of the fact that it had the characteristics of legislation.

*Additional qualifications for office.*

Judge Kading also argues that Rule 17 prescribes a prohibited additional qualification for holding office. On this point he relies upon *State ex rel. Kleist v. Donald*[52] for this proposition. But this case holds only that the legislature, in amending a law providing for an additional circuit, could not shorten the term of an incumbent, because this had "the effect to remove a judge

[50] *Supra,* footnote 19.
[51] (1961), 367 U. S. 820, 81 Sup. Ct. 1826, 6 L. Ed. 2d 1191.
[52] (1917), 164 Wis. 545, 160 N. W. 1067.

from office," which is forbidden by art. VII, sec. 6 of the constitution. *Kleist* sets forth no rule regarding additional qualifications for office.

There are dicta in other cases to the effect that, where the qualifications for an office are set forth in the constitution, no additional conditions may be attached except by constitutional amendment.[53] Yet, as to the judiciary, only qualifications for the supreme court justices and circuit court judges are established in the constitution.[54] Judge Kading is a county judge. The fact that he is also a probate judge, as described by art. VII, sec. 14, of the constitution, does not give him standing to assert this supposed rule, since this section prescribes no qualifications for office.

Even if Judge Kading were a circuit court judge, these statements in prior cases do not constitute a hard-and-fast rule that would invalidate Rule 17. They are dicta only. Moreover, Rule 17 is more accurately viewed as a condition which is ancillary to, and not in addition to, conditions set forth in the constitution for circuit court judges (no other compensation, no other public office). The purpose of these conditions is to avoid undue influence and conflict of interest, which is precisely the aim of Rule 17.

*Fundamental unfairness.*

Judge Kading cites *Board of Regents v. Roth*[55] and *Perry v. Sindermann*[56] to support his contention that ap-

---

[53] *State ex rel. Tesch v. Von Baumbach* (1860), 12 Wis. 344 (*310), 346 (*312); *Fordyce v. State ex rel. Kelleher* (1902), 115 Wis. 608, 92 N. W. 430; *State ex rel. Bloomer v. Canavan* (1914), 155 Wis. 398, 145 N. W. 44; *State ex rel. La Follette v. Kohler* (1930), 200 Wis. 518, 228 N. W. 895.

[54] Art. VII, secs. 7, 10 and 24, Wis. Const. For the same conclusion in a similar context, *see* 30 Op. Atty. Gen. (1941), 148.

[55] (1972), 408 U. S. 564, 92 Sup. Ct. 2701, 33 L. Ed. 2d 548.

[56] (1972), 408 U. S. 593, 92 Sup. Ct. 2694, 33 L. Ed. 2d 570.

plication of Rule 17 to sitting judges, without a period of adjustment, is fundamentally unfair and violative of due process. Both *Roth* and *Perry* do establish a broader definition of "liberty" and "property" as those terms are used in the fourteenth amendment. But, even if one makes the very large assumption that Rule 17 deprives Judge Kading of "liberty" or "property," the only teaching of *Roth* and *Perry* is that the person thus deprived is entitled to a prior hearing before he is deprived. That is, *Roth* and *Perry* are cases involving procedural due process, and not substantive due process, as Judge Kading apparently contends. In this case, the requirements of procedural due process were adhered to. Before Rule 17 was generally adopted, notice was given, and a public hearing was held in the supreme court. Before any consideration was given to depriving Judge Kading of anything, he was afforded a full opportunity to be heard, both before the Judicial Commission and before this court. *Roth* and *Perry* are inapposite to the facts of this case.

We conclude, therefore, that Rule 17 is valid in all respects as against the challenges made by Judge Kading and that he is obliged to comply with the provisions of Rule 17.

Because Judge Kading has apparently refused to comply with the provisions of Rule 17 because of his assertion that the rule is unconstitutional, and we have now sustained the rule, Judge Kading should be given a reasonable time to comply with the rule. Accordingly, the court will retain jurisdiction of these proceedings pending compliance or noncompliance. In filing his report as required by Rule 17, the disclosure of the assets and liabilities of his spouse is to be made to the extent that he possesses information on those items, if any.

*By the Court.*—Rule 17 is valid; compliance with the provisions of Rule 17 is ordered, compliance to be on or

before twenty days of this order; jurisdiction of these proceedings reserved pending further order of the court.

ROBERT W. HANSEN, J. *(dissenting)*. Can the appellate court in this state require trial judges to file an annual report of their incomes, assets and liabilities, such report to include the assets owned and liabilities owed by their spouses and legal dependents?[1]

*Power in legislature.* The power to command necessarily carries with it the power to enforce the command. So we deal not only with the power to establish rules of judicial conduct, but to provide sanctions or penalties for such rules not being met. Except for the power of the people to recall holders of judicial office,[2] the only constitutional authority for penalizing judicial misconduct is contained in art. VII, secs. 1 and 13 of the Wisconsin Constitution. Sec. 1 provides for impeachment by the state assembly and trial before the state senate of all civil officers, judges included.[3] Thus the power to

[1] As required by Rule 17, issued by this court by divided vote on June 28, 1974, effective December 31, 1974, as an addition or amendment of the state Judicial Ethics Code, issued by this court on November 14, 1967, effective January 1, 1968.

[2] Art. XIII, sec. 12, Wis. Const., providing, upon petition by a required number of qualified electors, elections shall be held ". . . for the recall of any elective officer after the first year of the term for which he was elected . . . ."

[3] Art. VII, sec. 1, Wis. Const. (as amended November, 1932), providing in part: "The court for the trial of impeachments shall be composed of the senate. The assembly shall have the power of impeaching all civil officers of this state for corrupt conduct in office, or for crimes and misdemeanors; but a majority of all the members elected shall concur in an impeachment. . . . No judicial officer shall exercise his office, after he shall have been impeached, until his acquittal. Before the trial of an impeachment the members of the court shall take an oath or affirmation truly and impartially to try the impeachment according to evidence; and no person shall be convicted without the concurrence of two-thirds of the members present. . . ."

impeach is constitutionally placed in the legislative branch of our state government. Sec. 13 of art. VII of the constitution provides that any judge may be removed from office by address of both houses of the legislature if two thirds of all the members elected to each house concur.[4] The only constitutional authority to discipline the judiciary now rests with the legislature. A change in this exclusivity of constitutional delegation of power has been proposed,[5] but we deal with the constitution as it is, not as it may some day read. The majority concedes that this appellate court has no authority under the Wisconsin Constitution to remove or suspend a judge from office. This court has so held.[6]

[4] Art. VII, sec. 13, Wis. Const. (as amended April, 1974), provides: "Any judge of the supreme, circuit, county or municipal court may be removed from office by address of both houses of the legislature, if two-thirds of all the members elected to each house concur therein, but no removal shall be made by virtue of this section unless the judge complained of shall have been served with a copy of the charges against him, as the ground of address, and shall have had an opportunity of being heard in his defense. On the question of removal, the ayes and noes shall be entered on the journals."

[5] In 1973, Assembly Joint Resolution 5 was considered by the legislature. (See: Wisconsin Legislative Council, "Report to the Legislature on Court Reorganization" (March, 1973)). It would have amended art. VII, sec. 13, of the Wisconsin Constitution, providing for legislative removal from judicial office, by adding: "Justices of the supreme court and all judges are subject to suspension or removal for cause or for disability by the supreme court in accordance with law and with procedural rules promulgated by the court. The office of the justice or judge is vacant on entry of the order for removal." This resolution for a proposed constitutional amendment was not passed by the legislature.

[6] In re Code of Judicial Ethics (1971), 52 Wis. 2d vii at page ix, this court promulgating, as to judges violating the court-issued Judicial Ethics Code, that: "A judge may be removed or suspended* from office for:

"(a) Willful violation of a rule of the Code of Judicial Ethics;

"(b) willful and persistent failure to perform his official duties;

However, the majority sees this court as somehow acceding to a right to punish, via contempt proceedings, by censure or reprimand, even though the power to suspend or remove a judge from office has been constitutionally placed with the legislature. This interpretation sees the removal from office of a judge for misconduct as one that, under our constitution, can be imposed only by the legislature as an appropriate penalty or sanction for misconduct, but sees the appellate court as having been delegated or retaining the right to impose the less onerous consequence of reprimand or censure. The writer sees the whole area of the consequences of judicial misconduct, from reprimand to removal, as having been constitutionally delegated to the legislative branch of our government. Such interpretation is supported by the provision in the impeachment constitutional provision, providing that the penalty may "not extend further than to removal from office."[7] So the writer would hold that the grant of disciplinary power to the legislature over judges may not extend further than removal from office, but includes the sole and exclusive right to censure or reprimand, as well as the sole and exclusive right under the constitution to remove judges from office. The writer would find the right to censure or reprimand a judge to be constitutionally placed, along with the right to suspend or remove from office, in the province of the

"(c)  habitual intemperance . . . ;

"(d)  conviction of a felony involving moral turpitude," but conceding, the asterisked footnote states: "*These sanctions require constitutional amendment." (The sanctions or penalties of reprimand or censure were not listed as similarly requiring constitutional amendment.)

[7] Art. VII, sec. 1, Wis. Const. (as amended November, 1932), providing in material part: ". . . Judgment in cases of impeachment shall not extend further than to removal from office, or removal from office and disqualification to hold any office of honor, profit or trust under the state; but the party impeached shall be liable to indictment, trial and punishment according to law."

legislature. The writer would place the right to enact rules related to judicial misconduct to be, subject to constitutional limits, in the same province.

*No express authority.* Such finding of a constitutional delegation to the legislature of any right to discipline judges is further buttressed by the absence of any express authority in the Wisconsin Constitution for this court to formally censure or reprimand for failing to comply with a rule of judicial conduct, not legislatively enacted. The Wisconsin Constitution, in creating the Wisconsin Supreme Court, expressly provided: "The supreme court, except in cases otherwise provided in this constitution, shall have *appellate* jurisdiction only . . . ." (Emphasis supplied.) [8] One needs only a dictionary to determine the limits of *"appellate*[9] jurisdiction only."* Whether this constitutional delineation of authority is seen as a grant of jurisdiction or as a limit upon the jurisdiction here makes no difference. What the court can do and what the court cannot do are alike spelled out. The supreme court in this state is limited to an *appellate* role, reviewing on appeal the actions and judgments of trial and inferior courts. There are only two exceptions, both in the same constitutional section. One is the power to issue certain writs in certain situations.[10] That is not applicable

---

[8] Art. VII, sec. 3, Wis. Const.

[9] *See:* Webster's, *New International Dictionary* (3d ed., unabridged), page 103: ". . . having the power to review and affirm, reverse, or modify the judgment or decision of another tribunal." *See also: Seiler v. State* (1901), 112 Wis. 293, 299, 87 N. W. 1072, this court holding: "Appellate jurisdiction extends only to the *revision of the decisions of inferior courts.*" (Emphasis in opinion.)

[10] Art. VII, sec. 3, Wis. Const., providing in material part: ". . . [I]t [the supreme court] shall have power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and other original and remedial writs, and to hear and determine the same."

in any way to the situation before us for we have no seeking of an original or remedial writ in the issuance of a judicial code provision or in seeking to enforce it. The other exception is that: "The supreme court shall have a general superintending control over all inferior *courts* . . . ." (Emphasis supplied.)[11] Our court has held that: "The superintending power is over the courts and not over the person who happens to be judge of the court acting in an administrative capacity."[12] The constitutional reference is to the court processes, and there is authority for holding that, even as to matters in litigation, it is a control that "will be exercised only at the behest of a party to a proceeding in an inferior court and then for his protection."[13]

The majority opinion responds that, while superintending control has up to now been used only to control courts in matters between parties to litigation, that does not mean that it cannot be broadened now or in the future. True enough, but only up to the limit of the constitutional authority delegated. We deal here with three separate and distinct grants of jurisdiction to the appellate court by the state constitution: (1) The appellate jurisdiction; (2) the original jurisdiction to be exercised by certain writs constitutionally named; and (3) the superintending control over inferior courts.[14] Our court has held:

---

[11] *Id.*

[12] *State ex rel. Department of Agriculture v. Aarons* (1946), 248 Wis. 419, 423, 22 N. W. 2d 160.

[13] *Petition of Heil* (1939), 230 Wis. 428, 430, 284 N. W. 42, where petitioner, not a party to the action in the trial court, sought to invoke "superintending control over inferior courts," this court holding: "It is considered that this court cannot entertain this action for two reasons: (1) Petitioner is not a party to the action in the circuit court, and it is a well established rule that superintending control will be exercised only at the behest of a party to a proceeding in an inferior court, and then for his protection . . . ."

[14] *Seiler v. State, supra,* footnote 9, at page 299, this court holding: "In that [art. VII, sec. 3, Wis. Const.], as has been

"The power of superintending control is the power to 'control the course of ordinary litigation in inferior courts,' as exercised at common law by the court of King's Bench, and by the use of writs specifically mentioned in the constitution and other writs there referred to or authorized."[15] The majority opinion responds that the decisions limiting "superintending control" to matters between parties to a litigation can be disregarded because "superintending" contemplates ". . . ongoing, continuing supervision in response to changing needs and circumstances." But the limitation in the constitution is not in the word "superintending." The limitation is in the phrase "over all inferior courts." Disregard of precedent in statutory or constitutional construction is hardly the general rule, but, if done, ought not to include going beyond a constitutional authority as expressly granted and expressly limited.[16]

Actually, language about control over inferior courts appears twice in the state constitution. First, the constitution gives to the supreme court a "superintending control over all inferior courts."[17] Secondly, the constitu-

---

decided, there are separate and distinct grants of jurisdiction: '(1) the appellate jurisdiction; (2) the superintending control over inferior courts; and (3) the original jurisdiction to be exercised by certain writs.' [Cases cited.] What the general nature of the limits of those distinct grants of power is, is a judicial question, and has been answered and the law in regard thereto firmly settled by the decisions of this court."

[15] *Id.* at page 299.

[16] *Id.* at page 300, this court holding: "The term 'superintending control' then had a well-defined meaning, and it, and none other, was carried into the constitution by the framers thereof. In order to correctly understand that meaning, we must view the constitution from the standpoint of its framers. If we were not anchored firmly to the common-law idea of the extent of mere superintending control of one court over another, as distinguished from appellate jurisdiction, we should drift at once into confusion in respect to the scope of the authority of this court."

[17] Art. VII, sec. 3, Wis. Const.

tion gives to circuit courts a "supervisory control" over "all inferior courts and tribunals."[18] It is difficult to see why the meaning or purpose would be any different in either reference. The majority does not suggest that the circuit courts have been given constitutional authority to order a report to them of assets owned or liabilities owed by spouses or children of county judges or municipal justices.

Thus, it was a long time ago that this court construed the constitutional grant of a superintending power over inferior courts to be limited to ". . . the power to 'control the course of ordinary litigation in inferior courts,' . . ." and only ". . . by the use of writs specifically mentioned in the constitution and other writs there referred to or authorized."[19] The construction then given the constitutional grant can now be altered, but what cannot be altered is the constitutional creation of this court as one with appellate jurisdiction only, given a superintending control only over inferior courts, not judges or their wives, and with original jurisdiction to be exercised only by certain named writs.[20] For it remains true, today as at the turn-of-the-century, as this court said then, that:

"While the true limits of judicial power must be jealously guarded and firmly maintained, it would be as dangerous to extend as to limit the same, by giving to the language in which the jurisdiction was granted a meaning different from that which was in mind when the grant was made. The power of superintending control, as has been decided and before indicated, has to do only with controlling inferior courts in the exercise of their jurisdiction by the use of instruments mentioned specifically in the constitution or authorized thereby; . . ."[21]

---

[18] Art. VII, sec. 8, Wis. Const.

[19] *Seiler v. State, supra,* footnote 9, at page 299.

[20] Art. VII, sec. 3, Wis. Const.

[21] *Seiler v. State, supra,* footnote 9, at page 300.

*No "inherent" power.* Perhaps recognizing the length and the structural weakness of the bridge attempted between a constitutional grant of a superintending control over inferior courts and holding a judge in contempt for failure to report his wife's assets and liabilities, the majority opinion begins with and stresses a claim of an "inherent" power of an appellate court to regulate and discipline trial judges. The claim is that the adoption of Rule 17 of the Judicial Ethics Code is an action of this court ". . . performed under its inherent power to function as the supreme court . . . ." In what it terms an "amplification" of such inherent power of an appellate court, the majority opinion does quote from a decision of this court that: "No one entertains the thought, whether it be called inherent or implied, that it is a power which transcends the constitution."[22] But no mention of the constitutional delegation or limitations upon the authority of this court accompanies the claim in the majority opinion that: ". . . this court, as the supreme court within a statewide system of courts, has an inherent power to adopt those statewide measures which are absolutely essential to the due administration of justice in the state." This claim of power is mind-boggling. Can it be seriously asserted that four members of this court can adopt any "statewide measures" that they consider "absolutely essential" to the "due administration of justice?"

Where in the Wisconsin Constitution is there any basis or foundation for so caesarean a claim to an unlimited and unqualified power to do whatever it considers "essential" without regard to the grant and limits to its authority in the state constitution itself? That constitution does establish a "judicial power" or judicial branch of government in this state, providing: "The judicial power of this state, both as to matters of law and equity,

---

[22] *In re Cannon* (1932), 206 Wis. 374, 393, 240 N. W. 441.

shall be vested in a supreme court, circuit courts, and courts of probate. . . ."[23] But this creation of an appellate court, trial courts and probate courts is followed, not only with a precise spelling out of the limited function of the appellate court, but also by an equally precise spelling out of the function and authority delegated to circuit courts as constitutionally established entities.[24] We do not deal here with the common-law authority of courts to determine who should constitute or become attorneys at law.[25] We do not deal with situations where public disclosure was required by statute,[26] accomplished by regulation secured through public initiative,[27] or pursuant to an express constitutional provision requiring disclosure.[28] We deal solely with the constitutional grants of authority to the appellate court and the trial courts in this state. Unless those constitutional provisions as to each and both are to be disregarded, the

---

[23] Art. VII, sec. 2, Wis. Const., entitled: "Judicial power, where vested."

[24] Art. VII, sec. 8, Wis. Const., entitled "Circuit Court, jurisdiction," providing: "The circuit courts shall have original jurisdiction in all matters civil and criminal within this state, not excepted in this constitution, and not hereafter prohibited by law; and appellate jurisdiction from all inferior courts and tribunals, and a supervisory control over the same. They shall also have the power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and all other writs necessary to carry into effect their orders, judgments and decrees, and give them a general control over inferior courts and jurisdictions."

[25] See: In re Integration of Bar Cases (1946), 249 Wis. 523, 25 N. W. 2d 500, and (1956), 273 Wis. 281, 77 N. W. 2d 602; Lathrop v. Donohue (1960), 10 Wis. 2d 230, 102 N. W. 2d 404, affirmed (1961), 367 U. S. 820, 81 Sup. Ct. 1826, 6 L. Ed. 2d 1191; and In re Cannon, supra, footnote 22.

[26] See: County of Nevada v. MacMillen (1974), 11 Cal. 3d 662, 114 Cal. Rptr. 345, 522 Pac. 2d 1345.

[27] See: Fritz v. Gorton (1974), 83 Wash. 2d 275, 517 Pac. 2d 911.

[28] See: Stein v. Howlett (1972), 52 Ill. 2d 570, 289 N. E. 2d 409.

writer sees no way in which the claim of an inherent power of the Wisconsin Supreme Court to discipline and penalize a trial court judge for failing to report his wife's assets and liabilities to the appellate court can be located or sustained.

To the contention that requiring public disclosure of a trial judge's personal assets, and those of his wife and dependents, this court went beyond "the ambit of the power of this court to promulgate," the majority opinion responds that this argument ". . . ignores the recent erosion of confidence in and respect for public officials which has been so detrimental to our system of government." The majority's reference obviously is to the public interest served by financial disclosures on the part of those in public employment. It is puzzling, however, for the "growing skepticism" to which the majority refers as to the integrity of public officials "at all levels," to some measure, derives in part from the claim of some in the executive branch of the federal government to an entitlement to do, not what the constitution or law of the land prescribed, but what, in their judgment, served the best interests or security of the nation. Mistakenly, they claimed and asserted an "inherent power" to do what they believed "absolutely essential" to the "due administration" of national affairs and security. Confusing the desirability of ends sought to be served with the legitimacy or constitutionality of means used does not serve either to lessen skepticism nor to strengthen constitutional government. The writer has not addressed himself to the desirability of the end sought to be served by Rule 17, but rather to the question of whether Rule 17 was, indeed, beyond "the ambit of the power of this court to promulgate."

*Separation of powers.* The writer concurs completely with the contention in petitioner's brief that: ". . . without an express grant of authority this court cannot create laws of judicial conduct, adjudge alleged violations

of those laws, and mete out discipline against judges . . . ."[29] Stated generally, it is for the legislature to enact the laws, for the executive branch to administer them, and for the judicial branch to interpret and, within constitutional limits, apply them. Ours is a government of checks and balances, with powers thus separated between legislative, executive and judicial branches. No one such branch is to enact the law, administer the law, interpret the law and impose the penalty for its violation, at least not in the absence of specific constitutional authorization so to do. It follows that this court, in the absence of constitutional authorization, had and has no authority to (1) promulgate a Rule 17 requiring trial judges to report their income, assets and liabilities, and the assets and liabilities of their spouses and dependents; (2) provide a penalty or sanction for noncompliance with such promulgated Rule 17; and (3) apply such penalty or sanction to a trial judge, here a probate judge, who fails or refuses to comply with the requirements of Rule 17. This court has said that it cannot legislate.[30] What is here accomplished goes well beyond legislating. Here this court makes the law, provides the penalty, administers the law and imposes the sanction for noncompliance. It would take, the writer submits, a constitutional amendment to make such merging of legislative, executive and judicial functions in a single court of one branch of our government constitutionally permissible.

For the reasons stated, each and all of them, the writer would hold that Rule 17, added to the Judicial Ethics Code, is not valid, being beyond the constitutional authority of this court to promulgate. It would then follow

[29] Brief in support of the Honorable Charles E. Kading that Rule 17 of the Code of Judicial Ethics and enforcement thereof are unconstitutional, at page 15.

[30] *Friedrich v. Zimmerman* (1941), 238 Wis. 148, 154, 298 N. W. 760, this court holding: "The courts have no power to legislate."

that the petitioner, the Honorable Charles E. Kading, is not in contempt of this court for failure to comply with the requirements of Rule 17. The writer would order the contempt proceedings against the Honorable Charles E. Kading dismissed.

I am authorized to state that Mr. Justice LEO B. HANLEY and Mr. Justice CONNOR T. HANSEN join in this dissent.

The following opinion was filed February 3, 1976.

WILKIE, C. J. *(on motion for rehearing)*. Sanctions available to the supreme court for violations of the Code of Judicial Ethics include reprimand, censure, or civil contempt. The Code of Judicial Ethics, as promulgated, specifically provides for reprimand or censure.[1] It is settled beyond any question in Wisconsin that all courts have an inherent power to hold in contempt these who disobey the court's lawful orders.[2] This power exists independently of statute for the fundamental reason that it "is a necessary incident to the exercise of judicial power and is reasonably to be implied from the grant of such power."[3] Of course, Wisconsin courts also possess, by virtue of statute, specific power of civil[4] and criminal[5] contempt. A violation with respect to the financial disclosure provisions of Rule 17, or of any of the other provisions of the Code of Judicial Ethics, is serious and this court must have the authority to enforce the provisions of the code through civil contempt.

---

[1] *Code of Judicial Ethics* (1967), 36 Wis. 2d 252, 153 N. W. 2d 873, 155 N. W. 2d 565. *See also: State v. McCarthy* (1949), 255 Wis. 234, 250, 38 N. W. 2d 679.

[2] *Appeal of Cichon* (1938), 227 Wis. 62, 67, 278 N. W. 1; *State ex rel. Rodd v. Verage* (1922), 177 Wis. 295, 305, 306, 187 N. W. 830.

[3] *Appeal of Cichon, supra,* footnote 2, at pages 67, 68.

[4] Sec. 295.01, Stats.

[5] Sec. 256.03, Stats.

Violations of the Code of Judicial Ethics, if determined to be in contempt of the court, are civil rather than criminal contempt. The real character of a contempt of court is determined by the nature of the relief sought,[6] and in cases involving violations of the code this court seeks to remedy the situation created by the violation and to enforce the collective private rights of the citizens of this state to impartial justice.

In this instance, if Charles E. Kading fails to comply with the provisions of Rule 17 for the year ending December 31, 1974, as mandated in these proceedings, he will be subject to reprimand and censure, but not civil contempt. The court, with the exception of the writer, concludes that his conduct is not contumacious and therefore will not resort to civil contempt in this instance.

*By the Court.*—The motion for rehearing is denied and Charles E. Kading is granted twenty days from the date of this order to file with the Judicial Commission the financial disclosure report as required for the year ending December 31, 1974.

ROBERT W. HANSEN, J. *(dissenting on rehearing).* The majority claims, the present case to be excepted, that it has the power to fine or imprison for civil contempt any circuit or county or municipal judge in this state who violates a rule in its Code of Judicial Ethics. These rules range from banning cameras in courtrooms[1] to requiring a judge to report the income and assets of his wife and children.[2]

It is not to be denied that, by statute, every court of record and every judge of such court in this state pos-

---

[6] *Wetzler v. Glassner* (1925), 185 Wis. 593, 596, 201 N. W. 740.

[1] Rule 14, *Code of Judicial Ethics* (1967), 36 Wis. 2d 252, 262, 153 N. W. 2d 873, 155 N. W. 2d 565.

[2] Rule 17, *In the Matter of the Amendment of Code of Judicial Ethics* (1974), 63 Wis. 2d vii.

sesses a definite, but limited, power to punish for civil contempt.[3] But such statute limits the power of courts to punish for civil contempt to misconduct ". . . by which the rights or remedies of a party in an action or proceeding pending or triable in such court . . . may be defeated, impaired, impeded or prejudiced . . . ."[4] Thus such statute relates and limits the application of punishment for civil contempt, not to violations of a judicial rule, but to actions or proceedings pending or triable in court. The writer would hold the power of civil contempt limited by the statute, and the situation here to be outside the limits of such statute.

However, the majority additionally claims that "independently of statute," all courts in this state ". . . have an inherent power to hold in contempt those who disobey the court's lawful orders." The writer does not find in state or federal constitutions any such grant of an awesome and unlimited power of trial courts or appellate courts to fine or jail those judges who violate its rules. Instead, the writer finds this court as having applied sec. 295.01, Stats., and having recognized its limits as to impositions of penalties in civil contempt cases. In this very term of court, in a case where a trial court went beyond the limits of the civil contempt statute in imposing liquidated damages for violation of a court injunction, this court set aside the penalty imposed as not statutorily authorized.[5] If the statute controls impositions of civil contempt penalties by trial courts for violations of their orders, it ought control impositions of penalties by an appellate court for violation of its orders. What is sauce for one ought to be sauce for the other.

Moreover, when this court established the sanctions that were to be imposed for a violation of a rule in its

[3] Sec. 295.01, Stats., **Contempt power of courts and judges.**

[4] *Id.*

[5] *Getka v. Lader* (1976), 71 Wis. 2d 237, 238 N. W. 2d 87.

judicial ethics code, it provided for only four possible penalties: (1) Removal from office; (2) suspension from office; (3) reprimand; and (4) censure.[6] As to the first two such sanctions, removal or suspension, this court gave the judicial commission only the power to make recommendations to this court.[7] As to the third and fourth of the possible sanctions, it decreed that such judicial commission could either reprimand or censure, but subject to review by this court.[8] It was these four sanctions, plus retirement for disability,[9] and only these four, that were made applicable to all appellate and trial judges in this state.[10]

However, only two of the four sanctions were made immediately effective. As to the sanctions of removal or suspension from office, this court then made clear that: "These sanctions require constitutional amendment."[11] Thus, under the rules then promulgated, only the penalties of reprimand or censure are set forth as immediately effective and available as penalties for violation by a judge of a code rule. Unless a trial judge is to hold court in his prison cell, it is difficult to see how imprisonment for contempt is not an equivalent to suspension from office. If constitutional amendment is required to validate a suspension from office for a rule violation, it is submitted that constitutional amendment, or at least legislative authorization, must precede the imposition of the at least equally onerous consequence of imprisonment for a rule violation. Even if there were an "inherent power" basis for such jailing or fining of a rule violator, it is submitted that the rule of court adding such sanction

---

[6] *Code of Judicial Ethics* (1972), 52 Wis. 2d vii, pages viii–ix.

[7] *Id.* at pages viii–ix, Rule 8.

[8] *Id.*

[9] *Id.* at page ix, Rule 10, this court noting: "Retirement for disability assumes enabling legislation therefor."

[10] *Id.* at page ix, Rule 12.

[11] *Id.* at page ix, footnote*.

for a violation of a rule in the ethics code should be amended in the same manner in which it was adopted. This would include holding a public hearing following public notice, as our rules provide.[12] A memorandum opinion attached to a denial of a motion for rehearing is not the way in which a court code or administrative rule should be altered, or the sanctions it establishes broadened. At the least, until the Code of Judicial Ethics is properly amended, this court ought be limited to the sanctions listed in the rules it has established and promulgated.

The following opinion was filed March 1, 1976.

PER CURIAM. Charles E. Kading has failed to file a financial disclosure report for the year ending December 31, 1974. By this repeated refusal he has defied the mandates of this court in *In re Honorable Charles E. Kading, Judge of County Court, Branch No. 1, Jefferson County, Wisconsin.* This failure is a violation of the Judicial Code of Ethics.

Because this challenge to Rule 17 and the Code of Judicial Ethics has been considered by this court to be a good-faith test case the court has chosen not to regard Kading's failure to file the report as contumacious. A new report for the year ending December 31, 1975, is due to be filed on or before March 15, 1976. A willful failure to again comply with the provisions of Rule 17 in regard to this report may expose him to being held in contempt of this court.

---

[12] Sec. 251.18, Stats., providing: ". . . All statutes relating to pleading, practice and procedure may be modified or suspended by rules promulgated pursuant hereto. No rule modifying or suspending such statutes shall be adopted until the court has held a public hearing with reference thereto. The court may establish days certain in each year at which dates the public hearings shall be held. Said hearings shall be held at 1:30 o'clock

Therefore, it is ordered that Charles E. Kading is severely reprimanded for willfully failing to file the required financial disclosure report for the year ending December 31, 1974.

in the afternoon, or at such other time as the court shall direct. Notice of public hearings shall be given by publication of a class 3 notice, under ch. 985, the expense of the publication to be paid out of the state treasury. Notice shall also be given in the official publication of the state bar of Wisconsin, said notice to be published not more than 60 days, not less than 30 days, before the date of hearing. . . ."